[No. B007758. Second Dist., Div. Seven. Dec. 17, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
CLARENCE THURMOND, Defendant and Appellant.

**COUNSEL**

Richard A. Lowe, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Robert F. Katz, Supervising Deputy Attorney General, and Cynthia Sonns Waldman, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**JOHNSON, J.**—Defendant was convicted by jury of attempted murder. Because defendant was prevented from fully and fairly presenting his defense, we are compelled to reverse.

### FACTS

It is undisputed the victim, Edna Ramirez, was shot in the throat by her lover, Clarence Thurmond, in the bedroom of their apartment. The People's theory was that defendant shot Ms. Ramirez during an angry dispute over whether she would leave the defendant and go home to her husband and children. Defendant denied there was any quarrel. He claimed he had his gun out to defend himself from an unknown intruder in the apartment, possibly Ms. Ramirez' husband; the gun went off by accident.

The People's case was entirely circumstantial. Not even the victim, Edna Ramirez, knew how the shooting took place. Ms. Ramirez suffered amnesia as a result of the shooting and remembers only a portion of what happened. What she remembers conflicts with the defendant's version. It also conflicts in part with the testimony of other witnesses for the People as well as defense witnesses. We summarize the trial testimony below.

### 1. THE PEOPLE'S CASE

Ms. Ramirez testified she returned to the apartment she shared with defendant about 9 p.m. She did not remember meeting anyone on the way in. She parked her car in the underground parking area and went directly to her apartment. She unlocked the door and entered, locking the door behind her. All the lights in the apartment were off but she could see the television was on in the bedroom. She entered the bedroom. Defendant was on the bed watching television.

After some preliminary conversation, Ms. Ramirez told defendant she wanted to move back home to her husband and children. She and defendant argued about her leaving. The argument was loud enough for the neighbors to hear. As far as she could remember, defendant never struck her. She never saw a gun. (There was no evidence of any injuries to Ms. Ramirez other than the gunshot wound.) She remembered starting toward the telephone. Defendant pushed her away. She said, "Help." The next thing she remembered was waking up in the hospital. Ms. Ramirez estimated between 10 and 15 minutes elapsed from the time she entered the apartment to the time her memory fails.

Mr. Suh lived in the apartment below Ms. Ramirez and defendant. On the night of the shooting he heard a man and woman arguing in the apartment upstairs. He also heard noises he described as "boom boom, you know, moving like moving noise" and a slapping noise as though someone was striking something. Mr. Suh went outside. There were lights on in the upstairs apartment and he could see shadows moving about. He heard a woman say, "Please don't" and "Help, help."

Mr. Suh returned to his apartment and told his wife, "Somebody must be beating the hell out of their wife . . . ." The fight lasted four or five minutes. Then, he heard a shot. He went outside again and met a neighbor, Mr. Reece. He and Mr. Reece went upstairs to Ms. Ramirez' apartment. Mr. Reece tried to open the door. It was locked. Mr. Reece kicked the door in and entered the apartment.

Mr. Reece testified he was watching television when he heard a gun shot. He immediately went outside. He could hear the defendant, Mr. Thurmond, screaming inside the apartment. Mr. Reece went to the apartment and knocked on the door. He kept knocking until defendant opened the door. After opening the door, defendant went into the bedroom. Mr. Reece saw defendant had a gun in his hand. He took the gun from defendant without any resistance. He then tried to give assistance to Ms. Ramirez.

## 2. THE DEFENSE CASE

Defendant testified he was asleep in the bedroom when he was awakened by a noise in the living room. All the lights in the apartment were off. The noise sounded like someone stumbling or bumping into furniture. His first thought was Ms. Ramirez' husband had taken her keys and entered the apartment. (As we discuss below, defendant was not allowed to testify why he thought the intruder was Ms. Ramirez' husband.) Defendant took his loaded revolver from the night stand by the bed, pulled the hammer back and aimed it toward the bedroom door. The bedroom door opened and a figure came into the room. He saw at once it was Ms. Ramirez. He tried to let the hammer down but the gun went off, the bullet striking Ms. Ramirez in the throat.

Ms. Webster, also a resident of the apartment building, testified for the defense. She and Ms. Ramirez arrived at the building at the same time and parked their cars a few spaces from each other. They exchanged greetings and walked toward their apartments. Ms. Webster estimated it took her three to five minutes to walk from her car to her apartment. Walking at a normal pace, Ms. Ramirez would have arrived at her apartment sooner because it was closer to the parking area. Ms. Webster testified when she

entered her apartment she went directly to the kitchen, took food out of the refrigerator and turned on the microwave. It was then she heard a noise like a gun shot. No more than a minute or two elapsed from the time she entered the apartment until she heard the gun shot.

## DISCUSSION ·

1. The Trial Court Erred in Excluding Circumstantial Evidence Tending to Prove Defendant's State of Mind at the Time of the Shooting.

Defendant admitted he shot Ms. Ramirez. The issue for the jury was whether the shooting occurred in the course of an attempted murder, attempted voluntary manslaughter or whether the shooting was accidental.

After defendant testified he was awakened by noises in the apartment, the following dialogue took place.

"Q. . . . So, what happened after you noticed this stumbling sound?

"A. Well, first thing I thought about was Edna's husband, you know. I thought maybe he had jumped on her and whatever and took the keys and come in.

"Q. What made you think it might be Edna's husband?

"A. Cause he gave her a rough time before and he had sent a message by her that—

"MR. SAUKKOLA: Object, your Honor, move to strike unless there is a showing of some personal knowledge here, your Honor. It is hearsay, speculation.

"MR. BRANSFIELD: Your Honor, may I be heard on that, please.

"THE COURT: The objection is sustained. Motion to strike is granted.

"MR. SAUKKOLA: Your honor, would the court please instruct the jury to disregard it.

"THE COURT: The jury will kindly disregard the last few remarks.

"MR. BRANSFIELD: Your honor, I would like to at this point say that any statements that Mr. Thurmond testifies to that other people may have made

are not offered for the truth of the matter asserted. They are offered to show Mr. Thurmond's state of mind.

"THE COURT: The objection is sustained.

"Q. BY MR. BRANSFIELD: Did you have some fear of Mr. Ramirez?

"MR. SAUKKOLA: Objection, leading.

"THE COURT: Sustained.

"Q. BY MR. BRANSFIELD: What was your attitude toward Mr. Ramirez?

"A. Well, I wasn't for sure about him. Like I say, he had roughed Edna around once or twice when she went to visit.

"MR. SAUKKOLA: Move to strike, your Honor. Same objection as before.

"THE COURT: Motion to strike is granted. The jury is instructed to disregard the last answer.

"Q. BY MR. BRANSFIELD: When you heard the noise in the front room you were somewhat concerned about it, is that right?

"A. Yes, I was.

"Q. What did you think it could possibly be that caused such a noise?

"A. Mr. Ramirez coming in for the fact—

"Q. Did it cross your mind that it could have been someone other than Mr. Ramirez?

"A. No.

"Q. Do you think it could have possibly been a burglar?

"A. Yes.

"Q. And that could—

"MR. SAUKKOLA: Object, ask your Honor that the court please request that counsel not continually lead the witness.

"THE COURT: The objection is sustained and counsel is instructed to ask questions and not leading questions. And counsel bear in mind that the court has sustained the objection and will steer clear of that type of questioning.

"MR. BRANSFIELD: Yes, your Honor.

"Q. BY MR. BRANSFIELD: Mr. Thurmond, did you know who it was that came from the front room?

"A. No, I didn't.

"Q. Did you have some idea who it might be?

"A. No."

■ The defendant contends the trial court erred in refusing to allow evidence to prove his state of mind at the time of the shooting. We agree.

Defendant argues, correctly, extrajudicial statements are not hearsay when offered to prove the state of mind evoked in another by their utterance. (*People* v. *Duran* (1976) 16 Cal.3d 282, 295 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1].) However, the question is not whether the testimony is hearsay but whether it is relevant. If defendant had shot Ms. Ramirez in the mistaken belief she was *Mister* Ramirez, defendant's state of mind— fear of harm from Mr. Ramirez—might have been relevant to the presence of malice and the justification of self defense. But, in the case before us, the defendant testified he knew the person who entered the bedroom was Edna Ramirez, not her outraged husband. The defense in this case was accident or misfortune. (Pen. Code, § 26, subd. Five.) Thus, evidence of defendant's purported state of mind was irrelevant to his guilt of attempted second degree murder or attempted voluntary manslaughter.

Defendant's state of mind was relevant, however, to the defense he did raise: accident or misfortune. According to defendant, when he heard a prowler in the living room he removed his loaded gun from the night stand, aimed it at the door and pulled the hammer back, locking it in place. When he saw Ms. Ramirez enter the bedroom he tried to let the hammer down so the gun would not go off. The gun went off anyway.

Penal Code section 26, subdivision Five, provides no crime is committed by a person who commits the act charged through misfortune or by accident, "when it appears that there was no evil design, intention, or culpable negligence." Under this section, the burden is on the defendant to establish the absence of evil design, intention and culpable negligence. Because the entire

defense hinged on defendant meeting this burden of proof, it was crucial the jury believe defendant acted reasonably out of fear of Ms. Ramirez' husband.

It was not enough for the jury to hear defendant testify he thought Mr. Ramirez had entered the apartment. Two critical questions remained unanswered. Did defendant have a reasonable basis for his belief? Did defendant have a reasonable basis for reacting to this belief by pointing a loaded gun at the bedroom door? The evidence defendant sought to introduce was intended to answer those questions. It was offered to prove defendant reasonably entertained the particular state of mind which he claimed. In order to negate evil design, intent and, especially, culpable negligence, it was necessary for defendant to explain to the jury why he believed Mr. Ramirez would come to defendant's home and why it was necessary for defendant to be prepared to use deadly force in self defense. By excluding the defendant's testimony, the trial court precluded the jury from hearing and evaluating relevant evidence on defendant's only defense. "Such extrajudicial statements which lend credibility to an asserted state of mind are relevant, competent evidence." (*People* v. *Duran, supra,* 16 Cal.3d at p. 295.)

2. The Trial Court Erred in Failing, *Sua Sponte,* to Instruct the Jury on the Meaning of "Culpable Negligence."

With our permission, defendant filed a supplemental brief in pro. per. In his brief, defendant argues the trial court should have defined for the jury the term "culpable negligence" as used in the CALJIC instruction on accident and misfortune.[1] The point is well taken. It was so held in *People* v. *Brucker* (1983) 148 Cal.App.3d 230, 239 [195 Cal.Rptr. 808].

In *Brucker,* the court acknowledged trial judges have a *sua sponte* duty to give amplifying or clarifying instructions where terms used in an instruction have a " ' " "technical meaning peculiar to the law." ' " " (*Id.* at p. 238, citations omitted.) The court found the term "culpable negligence" has a technical meaning peculiar to the law which is not commonly understood by the average person. The court referred to *People* v. *Peabody* (1975) 46 Cal.App.3d 43, 47 [119 Cal.Rptr. 780] for a definition of "culpable negligence." (*Id.*, at p. 239, fn. 8.) We agree with *Brucker* and with defendant. The trial judge erred in not giving a *sua sponte* instruction clarifying the meaning of the term "culpable negligence."[2]

---

[1]CALJIC No. 4.45, given by the trial court reads as follows: "When a person commits an act or makes an omission through misfortune or by accident under circumstances that show no evil purpose, intention or culpable negligence, he does not thereby commit a crime."

[2]Following the *Brucker* decision, a use note was added to CALJIC No. 4.45 stating if that instruction is given, an instruction defining "culpable negligence" must be given *sua sponte.* A new instruction, No. 4.45.1, was added in 1984 defining culpable negligence.

### 3. The Testimonial and Instructional Errors Were Prejudicial and Require Reversal for a New Trial.

 It deserves emphasis the "accident" defense was the defendant's sole hope for acquittal. It depended for its success on two things: that the jury would hear and believe defendant's explanation of how the shooting occurred; and, that the jury would properly apply the court's instruction on the accident defense. The trial court's errors made it virtually impossible for the defendant to succeed with this defense.

The bold assertion the gun went off by accident could easily be dismissed by the jury especially when posed against the People's circumstantial evidence to the contrary. Without an explanation why the defendant was in bed with a gun trained on the bedroom door, the explanation the gun went off by accident would receive little credence from a reasonable juror. The testimony defendant was allowed to give only raised more questions. Why did he believe the person who entered the apartment was his lover's husband and not his lover? Did he believe the husband intended him great bodily injury? If so, what was the basis for this belief? Defendant was not given the opportunity to answer these question, if he could.

The defense of accident or misfortune requires the defendant to prove three negatives: he did not act with an evil design; he did not act with intent; *and,* he did not act with "culpable negligence." We have no idea what "culpable negligence" meant to the jury. For instance, the jurors may have believed the defendant was culpably negligent in pointing a loaded gun in the intruder's direction because he had no reason to expect it was his lover's husband or to fear him that much. Or they may even have believed defendant was culpably negligent in keeping a loaded gun in his home.

 As a matter of law, ordinary negligence, sufficient for recovery in a civil trial, will not suffice to establish culpable negligence in a criminal trial. (*People* v. *Peabody, supra,* 46 Cal.App.3d at p. 47.) The conduct must be "aggravated or reckless." It "must be such a departure from what would be the conduct of an ordinarily prudent person under the same circumstances as to be incompatible with a proper regard for human life." (*Ibid.*)

Had the jury been properly advised of defendant's version of the shooting and properly instructed as to the accident defense, the jury could have made an intelligent decision whether to believe defendant's testimony and, if it believed the testimony, whether a defense of accident had been established. These errors compel reversal.

■ Instructional error will justify a reversal of the judgment where, as here, the jury is misdirected or misled upon an issue vital to the defense and the evidence does not point unerringly to the defendant's guilt. (*People v. Rogers* (1943) 22 Cal.2d 787, 807 [141 P.2d 722]; *People v. Wilson* (1967) 66 Cal.2d 749, 764 [59 Cal.Rptr. 156, 427 P.2d 820].) ■ Unlike the situation in *Brucker, supra,* 148 Cal.App.3d 230, where the court found harmless error, the factual question involved in the omitted definition was not resolved by the jury's finding on another count and the jury's implicit findings against defendant on the question of evil purpose and intent are tainted by the exclusion of a crucial portion of the defendant's testimony.

Furthermore, where the defendant has been wrongfully denied the opportunity to fully present his only defense, it is difficult to deny the reasonable probability of a result more favorable to the defendant had his exculpatory evidence not been excluded. (Cf. *People v. Duran, supra,* 16 Cal.3d at pp. 295-296.) Whether a properly instructed jury would have believed defendant's testimony and acquitted him calls for speculation beyond our powers. One of our essential responsibilities is to preserve the right of every accused person to present his or her version of the case to the jury. (See *People v. Spearman* (1979) 25 Cal.3d 107, 119 [157 Cal.Rptr. 883, 599 P.2d 74].)

4. The Claim the Trial Judge Slept During the Trial Is Not Supported by the Record and Cannot Be Considered in This Appeal.

■ Defendant claims the trial judge fell asleep during his cross-examination. Such a charge, if proven, could be an independent ground for reversing defendant's conviction. (Cf. *Javor v. United States* (9th Cir. 1984) 724 F.2d 831 [habeas corpus granted where defendant's attorney slept through portions of the trial] with *Ettus v. Orkin Exterminating Co.* (1983) 233 Kan. 555 [665 P.2d 730, 739] [judge sleeping during civil trial requires showing of prejudice for reversal].)

There is no evidence in the record before us to support defendant's claim. Under well-established appellate rules, this court may not consider alleged facts which are wholly outside the record on appeal. (*People v. Jarrett* (1970) 6 Cal.App.3d 737, 739 [86 Cal.Rptr. 15].) Where the record is silent, the judgment of the lower court is presumed correct. (*Lucero v. Superior Court* (1981) 122 Cal.App.3d 484, 489 [176 Cal.Rptr. 62].)

## Disposition

The judgment is reversed.

Lillie, P. J., and Thompson, J., concurred.