[No. A084321. First Dist., Div. One. Dec. 16, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
CLEVE RYAN III, Defendant and Appellant.

## COUNSEL

L. Richard Braucher, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, René A. Chacón and Bridget Billeter, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SWAGER, J.**—Appellant was convicted following a jury trial of child abduction (Pen. Code, former § 278), and admitted that he suffered a prior violent or serious felony conviction for purposes of Penal Code section 667, subdivision (e).[1] On appeal, he claims that the evidence does not establish his lack of the right of custody of the child as necessary to support the child abduction conviction, and objects to the trial court's failure to give an instruction further defining the "right of custody" as an element of the offense. We find that the conviction is supported by substantial evidence. We further find that instructional error was committed, but no prejudice to appellant resulted. We therefore affirm the judgment.

### STATEMENT OF FACTS

Appellant and Carolyn Ryan[2] were married on January 22, 1980. They remained married until Carolyn filed for divorce on June 29, 1995, but had an unconventional marital relationship. They lived together very infrequently between 1980 and 1991, sharing an apartment for only "about six months or so." Otherwise, Carolyn lived "basically" with her mother in Oakland, and had "no idea" where appellant lived.

Carolyn became pregnant with her son Cleve in September of 1990, and informed appellant of the pregnancy two or three months later. Appellant's response was, "I don't believe it's mine," and he continued to deny paternity for at least a year thereafter. Around November of 1990, appellant left the Oakland area, and moved to Washington, although Carolyn did not know either his address or telephone number there. During her pregnancy, Carolyn saw appellant "maybe three times."

Cleve was born on July 3, 1991. Carolyn gave differing approximations on appellant's first contact with the child: according to her preliminary examination testimony, appellant did not see Cleve for "a good year and a half, two years"; at trial, she changed the age of the child to "five or six months old" when appellant first visited with him.[3] Carolyn estimated that when Cleve was "[m]aybe a year" old, appellant finally admitted he was the father. Between the child's birth and June 20, 1995, appellant visited him approximately three times.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] We will refer to the witnesses and involved parties by their last names after introduction, with the exception of Carolyn Ryan, her son Cleve Ryan IV, and appellant's sister Lisa Ryan, who, for the sake of clarity and convenience, will be referred to by their first names, Carolyn, Cleve, and Lisa, respectively.

[3] Carolyn's testimony at the preliminary examination differs considerably from her testimony at trial; when the inconsistencies are significant we will note them.

Carolyn testified that she was the "sole custodial parent" of Cleve. She and her mother Sadie Smith provided essentially all of the financial support for the child. Most of the time, they lived at the home of Smith on 43d Street in Oakland. Smith was "very close" to Cleve, having "helped raise him from the day he was born." Appellant did not make regular or even periodic support payments to Carolyn; nor did he furnish a home for his son. On "one Christmas," appellant sent Carolyn a "big box" of clothes and other "things" for Cleve. Carolyn claimed at trial that she did not request support payments from appellant. Rather, when she needed "things" for Cleve she "would tell" appellant, and he occasionally sent money or items to her. At the preliminary examination, Carolyn testified that appellant refused her requests for support. Nevertheless, while appellant and Carolyn were no longer romantically involved by 1995, they were neither hostile with each other nor had disagreements about the nature of appellant's relationship with his son.

On June 20, 1995, appellant flew from Washington to Oakland. Carolyn testified at trial that while she and appellant had previously discussed "him taking [Cleve] back to Washington with him," no specific date to do so had ever been set by them. When appellant arrived in Oakland on June 20th, however, Carolyn knew his purpose was to return to Washington with the child. In fact, he showed her two tickets for a return flight to Washington the next day. At the preliminary examination she testified, in contrast, that she never gave appellant permission to take Cleve to Washington, and did not discuss the matter with him that day. She made the same statement earlier to Dolores Rutzen, an intern with the district attorney's office.

Appellant arrived at Smith's house with his sister Lisa around 5:00 in the evening on June 20. He asked Carolyn for permission to take Cleve to Chuck E. Cheese in Hayward or San Leandro for "an hour or two," and Carolyn agreed. Carolyn testified that she did not give appellant her consent to take Cleve to Washington with him. Cleve did not have a change of clothes, toys, or any other of his belongings with him when he left with appellant that evening. By 7:00 or 8:00 p.m., appellant called Carolyn from his nephew's house to report that Cleve had gone to McDonald's with one of appellant's sisters. He assured Carolyn that "everything was fine," and promised to call her or return with Cleve to Smith's house in about an hour.

Carolyn called appellant back in an hour and asked to speak with Cleve. Appellant told her Cleve was still "not back yet." By 10:00 or 11:00 p.m., Carolyn and her mother went to the home of appellant's nephew in Berkeley looking for Cleve. Appellant was there, but reported to Carolyn that Cleve was still "with his sister" at her house. Smith became "excited," and advised

appellant that she "wanted to see the baby." Smith then left in the car while Carolyn stayed with appellant at his nephew's house.

Smith returned 30 minutes later with Carolyn's brother and sister. Appellant said "the baby is all right," but when he refused to tell them where Cleve was, Smith became "hysterical." She called the police despite Carolyn's plea that "we don't need no police." They then drove to the home of appellant's sister, Rene Williams, in El Cerrito about midnight. When they arrived, the police were there, but Cleve was not. They returned to Smith's house in Oakland around 1:00 a.m. Carolyn was not worried or upset; she told Smith, "don't worry Mom, the baby is going to be all right."

The next morning between 7:00 and 8:00, Smith, Carolyn, and her brother and sister went to the Oakland Airport to search for Cleve. Appellant had informed Carolyn that he had tickets for a 9:00 a.m. return flight to Seattle that day. They looked around the airport for about an hour, but did not find Cleve or appellant, whereupon they returned to Smith's house.

From her house, Smith called the Oakland Police Department to report that Cleve had possibly "been taken away" by appellant. Carolyn remained calm. She advised the responding officer when he arrived that she knew the child was in Washington with appellant. After speaking with Carolyn, the officer determined that "a crime had not been committed," and filed no report of the incident.

Carolyn next heard from appellant two days later, when he called her from his home in Bremerton, Washington. Appellant told Carolyn that Cleve was with him. Carolyn spoke with Cleve, who, she testified at trial, sounded normal to her. Appellant denied Carolyn's request for his telephone number and address for fear that Carolyn or her mother would "send the police." Instead, appellant suggested an arrangement whereby Carolyn would call his sister Lisa, who in turn would contact him with a message to call Carolyn back. Carolyn followed this procedure for a few days, but protested that she wanted appellant's telephone number so she "could call and talk to Cleve" directly. Carolyn threatened to report the matter to the police unless she was given appellant's telephone number, but appellant warned her, "I'll run with him, or you'll never see him again or something."[4] Appellant then provided Carolyn with his telephone number.

On June 23, 1995, Officer George Bonilla of the Oakland Police Department responded to a report from Smith that Cleve had been abducted by

---

[4]At trial, Carolyn did not recall that appellant made this threat, which she had previously reported in her statement to the police and recounted in her testimony at the preliminary examination.

appellant. Smith was "still sick" that Cleve had not been returned. Officer Bonilla discussed the matter with Carolyn, who was not upset and stated that "the child was not taken," and was "okay." Smith reported to the officer that Carolyn was uncooperative because of her fear of appellant. Officer Bonilla told Smith that he "would try to find" Cleve.

On June 26, 1995, Officer Edwin Bermudez spoke with Carolyn, who indicated that "she wanted to press charges" against appellant. She appeared at Bermudez's office the next day with Smith to furnish him with photographs of Cleve. Carolyn reported that appellant "refused to tell her where he was living," and "threatened that if she went to the police that he would disappear with the child and that she would never ever see the kid again."

On June 29, Carolyn and Smith appeared at the district attorney's office to report to intern Dolores Rutzen that "their baby [had been] stolen." According to Rutzen's testimony, Carolyn stated that she had given permission for appellant to take Cleve to Chuck E. Cheese for only "a couple of hours," not to take him to Washington. Carolyn, who seemed quite upset to Rutzen, expressed concern about her child's health and welfare. She also told Rutzen that Cleve was crying, hungry and "said he wanted to go home" when she spoke by telephone with him at appellant's residence in Washington. Appellant threatened to hurt Carolyn or the child if she contacted the police. Rutzen assisted Carolyn in commencing an action against appellant for divorce and custody of the child.

Later that day, Officer Bermudez met with Carolyn and Smith at the district attorney's office to proceed with the investigation and efforts to locate the child. Officer Bermudez thought they both seemed distressed, particularly Smith. Carolyn repeated her concern for Cleve's welfare and appellant's threat to disappear with the child if she "went to the police." Carolyn signed a statement that she wanted appellant arrested and prosecuted.[5] Officer Bermudez presented the case to the district attorney's office for charging, and obtained a warrant for appellant's arrest. The police department in Bremerton, Washington arrested appellant under the warrant, and the next day Carolyn traveled to Seattle to retrieve Cleve.

After the preliminary examination, Carolyn asserted that some of her testimony was "a mistake," and requested the district attorney's office to

---

[5]At trial, Carolyn denied that appellant ever threatened her, and testified that she signed the statement in the district attorney's office only when pressured by her mother to do so to "get Cleve" back. Carolyn signed another statement after a meeting with Officer Bermudez on August 7, 1995, in which she complained that appellant had made harassing telephone calls to her.

"drop the charges" against appellant. She insisted that she had given permission to appellant to take the child to Washington, but the prosecutor "wouldn't listen" to her.

DISCUSSION

I. *The Sufficiency of the Evidence to Support the Conviction of Child Abduction.*

 Appellant argues that the evidence fails to prove his lack of "a right of custody to his son," as required to support a conviction of child abduction under former section 278.[6] (See *People* v. *Johnson* (1984) 151 Cal.App.3d 1021, 1024 [199 Cal.Rptr. 231].) As the husband of Carolyn and presumed father of the child (Fam. Code, § 7611), appellant had an equal right to custody of Cleve (Fam. Code, § 3010), despite the lack of a prior judicial determination of his status.[7] (*People* v. *Johnson, supra,* at pp. 1025-1026; *Cline* v. *Superior Court* (1982) 135 Cal.App.3d 943, 947 [185 Cal.Rptr. 787].) The evidence offered at trial did not prove, appellant maintains, that he lost his right to custody by abandonment of the child within the meaning of former section 279, subdivision (f). Appellant therefore posits that an element essential to a conviction of a violation of former section 278, the absence of his right to custody of the child, was not established by the evidence.

 We must of course review the evidence in accordance with the substantial evidence rule. " 'When considering a challenge to the sufficiency

---

[6]Former sections 278 and 279, which were repealed in 1996 (Stats. 1996, ch. 988, § 8), were still in effect when the charged crime was committed and govern the present case, as the parties agree. Former section 278 provided: "Every person, not having a right of custody, who maliciously takes, detains, conceals, or entices away, any minor child with intent to detain or conceal that child from a person, guardian, or public agency having the lawful charge of the child shall be punished by imprisonment in the state prison for two, three or four years, a fine of not more than ten thousand dollars ($10,000), or both, or imprisonment in a county jail for a period of not more than one year, a fine of not more than one thousand dollars ($1,000), or both."

Section 278 currently reads: "Every person, not having a right to custody, who maliciously takes, entices away, keeps, withholds, or conceals any child with the intent to detain or conceal that child from a lawful custodian shall be punished by imprisonment in a county jail not exceeding one year, a fine not exceeding one thousand dollars ($1,000), or both that fine and imprisonment, or by imprisonment in the state prison for two, three, or four years, a fine not exceeding ten thousand dollars ($10,000), or both that fine and imprisonment." The principle change in the statute by the 1996 amendment was to replace the clause "from a person, guardian, or public agency having the lawful charge of the child," with the phrase "from a lawful custodian."

[7]The Attorney General concedes that appellant must be considered "the presumed father of Cleve," with a "right of custody" by "operation of law."

of the evidence to support a criminal conviction, ". . . the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' [Citations.]" (*People* v. *Williams* (1997) 16 Cal.4th 635, 678 [66 Cal.Rptr.2d 573, 941 P.2d 752].) " 'The court must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. . . . If the circumstances reasonably justify the trial court's findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding." ' " (*People* v. *Dominguez* (1995) 38 Cal.App.4th 410, 421 [45 Cal.Rptr.2d 153], citations omitted; see also *People* v. *Alvarez* (1996) 14 Cal.4th 155, 225 [58 Cal.Rptr.2d 385, 926 P.2d 365].)

Former section 278 required that the taking, concealing or detaining of a child was by a person " 'not having a right of custody.' " (*People* v. *Johnson, supra,* 151 Cal.App.3d at p. 1024.) "The taking contemplated by the statute [was] a taking with intent to detain and conceal the child from the person having lawful charge of such child." (*People* v. *Hyatt* (1971) 18 Cal.App.3d 618, 623 [96 Cal.Rptr. 156].) The "right of custody" for purposes of former section 278 was defined in former section 279, subdivision (f)(2), to mean "the *right to physical custody* of the child. In the absence of a court order to the contrary, a parent loses his or her right of custody of the child to the other parent if the parent having the right of custody is dead, is unable or *refuses to take the custody*, or has *abandoned* his or her family."[8] (Stats. 1992, ch. 163, § 107, p. 786, italics added.) " 'In the absence of an order or decree affecting the custody of a child, it is generally held that a

[8]Former section 279, subdivision (f) read in full: "For purposes of Sections 277, 278, and 278.5: [¶] (1) 'A person having a right of custody' means the legal guardian of the child, a person who has a parent and child relationship with the child pursuant to Section 3010 of the Family Code, or a person or an agency that has been granted custody of the child pursuant to a court order. [¶] (2) A 'right of custody' means the right to physical custody of the child. In the absence of a court order to the contrary, a parent loses his or her right of custody of the child to the other parent if the parent having the right of custody is dead, is unable or refuses to take the custody, or has abandoned his or her family." (Stats. 1992, ch. 163, § 107, p. 786.)

Section 277 has replaced former section 279, and now states in subdivision (e) in pertinent part, as did the former section 279: "A 'right to custody' means the right to the physical care, custody, and control of a child pursuant to a custody order as defined in subdivision (b) or, in the absence of a court order, by operation of law, or pursuant to the Uniform Parentage Act contained in Part 3 (commencing with Section 7600) of Division 12 of the Family Code." Subdivision (f) of section 277 currently states: "In the absence of a court order to the contrary, a parent loses his or her right to custody of the child to the other parent if the parent having the right to custody is dead, is unable or refuses to take the custody, or has abandoned his or her family. A natural parent whose parental rights have been terminated by court order is no longer a lawful custodian and no longer has a right to physical custody."

parent, or one assisting such parent, does not commit the crime of kidnapping by taking exclusive possession of the child.' [Citations.]" (*Wilborn* v. *Superior Court* (1959) 51 Cal.2d 828, 830 [337 P.2d 65].)

Nevertheless, parents without custody were not excepted from the scope of former section 278. (*U.S.* v. *Lonczak* (9th Cir. 1993) 993 F.2d 180, 183, fn. 7; *People* v. *Rios* (1986) 177 Cal.App.3d 445, 451 [222 Cal.Rptr. 913]; *People* v. *Irwin* (1984) 155 Cal.App.3d 891, 896-897 [202 Cal.Rptr. 475].) A parent who had joint legal custody but not physical custody of a child could violate former section 278. (*People* v. *Irwin, supra*, at p. 896.) "The status of 'legal' custodian [was] extraneous to the manifest purpose of [former] section 278 which [had] to do with physical custody." (*Ibid.*) "A parent with bare legal custody [was] not a parent having lawful charge and, symmetrically, not a person with a right of custody." (*Id.*, at p. 897.) Thus, the focus of our inquiry must be upon the status of appellant's right to physical custody when Cleve was taken to Washington, notwithstanding his general right to legal custody as the father of the child.

Where, as here, no court order establishes custody, reference is made in former section 279, subdivision (f)(1) to "Section 3010 of the Family Code" to define the right of custody. Family Code section 3010, in turn, grants equal custody of the child to the mother and presumed father. In language essentially identical to former section 279, Family Code section 3010 further provides: "If one parent is dead, is unable or refuses to take custody, or has abandoned the child, the other parent is entitled to custody of the child." Thus, for purposes of former section 278, absent a custody order a presumed father such as appellant retains the right to physical custody of his child unless it is relinquished by the means identified in the governing statutes: death, inability or refusal to take custody, or abandonment of the child.

We find in the record before us ample evidence that appellant *refused* to take custody of Cleve. For the first year of the child's life, he denied paternity. Appellant moved from Oakland, where the child lived with his mother, to Washington, without even advising Carolyn of his address or whereabouts. He sent no support payments to Carolyn, and visited with the child approximately three times in the first four years of his life. Carolyn testified unequivocally that she was the "sole custodial parent" of Cleve. While Carolyn's testimony was rife with inconsistencies, the evidence, viewed as it must be on appeal in the light most favorable to the judgment, establishes that appellant declined her requests to support Cleve—save perhaps a box of clothes and other sundry items on a few rare occasions—and never provided him with a home. Appellant may not have explicitly

announced his refusal to take custody, but from the evidence presented the inference that he did so is inescapable.

We further conclude that substantial evidence establishes that the appellant *abandoned* the child. The meaning of "abandonment" is not provided in former section 279 or section 3010 of the Family Code, but the term has been given specific and technical definition by statute and case law.[9] The definition of " 'abandonment' most frequently employed by appellate opinions" is " 'an actual desertion, accompanied with an intention to entirely sever, so far as it is possible to do so, the parental relation and throw off all obligations growing out of the same' . . . ." (*In re Daniel M.* (1993) 16 Cal.App.4th 878, 882 [20 Cal.Rptr.2d 291], quoting from *Guardianship of Snowball* (1909) 156 Cal. 240, 243 [104 P. 444]; *Adoption of Michael D.* (1989) 209 Cal.App.3d 122, 136 [256 Cal.Rptr. 884]; *In re Brittany H.* (1988) 198 Cal.App.3d 533, 549 [243 Cal.Rptr. 763]; *In re Bisenius* (1959) 173 Cal.App.2d 518, 521 [343 P.2d 319].)[10] The word "abandons" as used in section 271a[11] to prove the crime of abandonment or failure to maintain a child under the age of 14, "applies to the act of intentionally failing to supply the needs of the child, while in the guardianship cases . . . it is used to describe an act of complete relinquishment of the right of parental control." (*People* v. *Stephens* (1938) 30 Cal.App.2d 67, 70 [85 P.2d 487].) In statutory proceedings to declare a child free from parental custody and control, "abandonment" is more precisely and thoroughly defined in Family Code, section 7822, subdivision (a), as occurring where the child has been "left by both parents or the sole parent in the care and custody of another for a period of six months or by one parent in the care and custody of the other parent for a period of one year without any provision for the child's support, or without communication from the parent or parents, with the intent on the part of the parent or parents to abandon the child."

[9]In contrast, the term "refuses to take custody" has not been further defined in the statutes or case law.

[10]Cases have also referred to the Webster's New International Dictionary definition of "abandonment": " ' "To relinquish or give up with the intent of never again resuming or claiming one's rights or interests in; to give up absolutely; to forsake entirely; to renounce utterly; to relinquish all connection with or concern in; to desert, as a person to whom one is bound by a special relation of allegiance or fidelity; to quit; to forsake." ' " (*In re Daniel M., supra*, 16 Cal.App.4th at p. 883, quoting *In re Cattalini* (1946) 72 Cal.App.2d 662, 669 [165 P.2d 250], italics omitted.)

[11]Section 271a reads: "Every person who knowingly and willfully abandons, or who, having ability so to do, fails or refuses to maintain his or her minor child under the age of 14 years, or who falsely, knowing the same to be false, represents to any manager, officer or agent of any orphan asylum or charitable institution for the care of orphans, that any child for whose admission into such asylum or institution application has been made is an orphan, is punishable by imprisonment in the state prison, or in the county jail not exceeding one year, or by fine not exceeding one thousand dollars ($1,000), or by both."

■ Intent to abandon the child must be proved to establish abandonment. (*In re Daniel M., supra,* 16 Cal.App.4th at p. 885; *In re B. J. B.* (1986) 185 Cal.App.3d 1201, 1212 [230 Cal.Rptr. 332]; *In re Bisenius, supra,* 173 Cal.App.2d at p. 521.) " 'Intent to abandon, as in other areas, may be found on the basis of an objective measurement of conduct, as opposed to stated desire.' (*In re Rose G.* [(1976)] 57 Cal.App.3d [406,] 424 [129 Cal.Rptr. 338].) In determining a parent's intent to abandon, the trial court may consider not only the number and frequency of his or her efforts to communicate with the child, but the genuineness of the effort under all the circumstances (*In re Jack H.* (1980) 106 Cal.App.3d 257, 265 [165 Cal.Rptr. 646]), as well as the quality of the communication that occurs . . . ." (*In re B. J. B., supra,* at p. 1212.) Subdivision (b) of Family Code section 7822 further states that the "failure to provide support, or failure to communicate is presumptive evidence of the intent to abandon. If the parent or parents have made only token efforts to support or communicate with the child, the court may declare the child abandoned by the parent or parents." Proof of an "intent to abandon for the statutory period," rather than permanently, suffices. (*In re Daniel M., supra,* at p. 886.)

■ The issue of abandonment is one of fact governed on appeal by the substantial evidence rule. Thus, "[a]ll evidence most favorable to the respondents must be accepted as true and that which is unfavorable discarded as not having sufficient verity to be accepted by the trier of fact." (*In re Baby Boy S.* (1987) 194 Cal.App.3d 925, 931 [240 Cal.Rptr. 60]; see also *Adoption of Oukes* (1971) 14 Cal.App.3d 459, 466 [92 Cal.Rptr. 390]; *In re Salazar* (1962) 205 Cal.App.2d 102, 106 [22 Cal.Rptr. 770].)

■ Under any of the recognized definitions of "abandonment," appellant lost his right to custody of Cleve. Appellant deserted the child, voluntarily leaving him to the sole care of Carolyn and her mother for nearly four years. With only rare exceptions, appellant had no communication with the child, and did not provide financial assistance. At best, appellant had contact with Cleve on a few occasions over a nearly four-year period, and made negligible contributions to his support. His token assistance and efforts to communicate constitute presumptive evidence of appellant's intent to abandon the child, and nothing in the record rebuts the presumption. (*Adoption of Oukes, supra,* 14 Cal.App.3d at p. 466; *In re Neal* (1968) 265 Cal.App.2d 482, 487 [71 Cal.Rptr. 300]; *In re Bisenius, supra,* 173 Cal.App.2d at p. 522; *Howton* v. *Howton* (1942) 51 Cal.App.2d 323, 326 [124 P.2d 837].)

In short, appellant entirely abdicated his role and responsibilities as Cleve's father. " '[T]he legal obligations of parenthood include the duties of

support, of care and protection, and of education. As compensation therefor, the law recognizes certain rights in the parent . . . .' [Citation.] A parent is by law the natural guardian and entitled to the custody of the person of a minor." (*State of California* v. *Superior Court* (1978) 86 Cal.App.3d 475, 482 [150 Cal.Rptr. 308].) Appellant cannot completely ignore his obligations to his child, then avoid a conviction of child abduction by conveniently asserting a right of custody when it serves him to do so. Finally, appellant's abrupt appearance in Oakland and abduction of Cleve did not somehow resurrect his custodial rights. "Simply stated, a child cannot be abandoned and then put 'on hold' for a parent's whim to reunite." (*In re Daniel M., supra,* 16 Cal.App.4th at p. 885.) We find substantial evidence in the record of appellant's loss of the right of custody of Cleve through abandonment, followed by an unlawful detention and concealment of the child in violation of section 278. (*In re Marcel N.* (1991) 235 Cal.App.3d 1007, 1013 [1 Cal.Rptr.2d 240]; *In re B. J. B., supra,* 185 Cal.App.3d at pp. 1212-1213; *People* v. *Irwin, supra,* 155 Cal.App.3d at p. 896; *People* v. *Hyatt, supra,* 18 Cal.App.3d at p. 623; *In re Maxwell* (1953) 117 Cal.App.2d 156, 165 [255 P.2d 87]; *In re Peterson* (1943) 56 Cal.App.2d 791, 794 [133 P.2d 831]; *People* v. *Stephens, supra,* 30 Cal.App.2d at p. 69.)

II. *The Trial Court's Failure to Define "Abandonment" for the Jury.*

 We turn to appellant's contention that the trial court erred by failing to provide the jury with a definition of the term "abandoned" as used in former section 279. Defense counsel proposed an instruction on "right of custody" which read: "A person who had a right to custody of a child does not violate the law by obtaining that child, *in the absence of a lawful court order to the contrary.* [¶] A biological father has a right of custody if he is married to the natural mother at the time the child is born. [¶] A biological father may lose his right to custody by proof of facts that establish he was unable, or refuses to take custody of the child, or had abandoned the child. [¶] Mere acquiescence in support of the child by others, failure to pay for maintenance when no demand therefor has been made, or failure to provide when no ability to provide has been shown, do not prove an intent to abandon. [¶] The prosecution has the burden of proving beyond a reasonable doubt that the defendant had lost his right to custody at the time of the alleged commission of the offenses herein. If you are not satisfied beyond a reasonable doubt that it is true, you must find that the defendant maintained his right to custody." The requested instruction was refused on the grounds that it was "somewhat argumentative," and the CALJIC No.

9.72 instruction given by the court adequately "laid out the parameters."[12] Appellant maintains that the trial court had the duty to either give the proffered defense "pinpoint" instruction, or instruct sua sponte on the definition of the term "abandoned."

■ "Upon proper request, a defendant has a right to an instruction pinpointing the theory of defense." (*People* v. *Randolph* (1993) 20 Cal.App.4th 1836, 1841 [25 Cal.Rptr.2d 723]; see also *People* v. *Barrick* (1982) 33 Cal.3d 115, 132 [187 Cal.Rptr. 716, 654 P.2d 1243].) Further, " '[i]t is the trial court's duty to see that the jurors are adequately informed on the law governing all elements of the case to the extent necessary to enable them to perform their function. This duty is not always satisfied by a mere reading of wholly correct, requested instructions. . . . A trial court has a sua sponte duty (1) to instruct on general principles of law relevant to issues raised by the evidence . . . ; and (2) to give explanatory instructions when terms used in an instruction have a technical meaning peculiar to the law . . . .' " (*People* v. *Enriquez* (1996) 42 Cal.App.4th 661, 665 [49 Cal.Rptr.2d 710], citations omitted.) "The 'general principles of law governing the case' are those principles connected with the evidence and which are necessary for the jury's understanding of the case. [Citations.] As to pertinent matters falling outside the definition of a 'general principle of law governing the case,' it is 'defendant's obligation to request any clarifying or amplifying instruction.' [Citation.]" (*People* v. *Estrada* (1995) 11 Cal.4th 568, 574 [46 Cal.Rptr.2d 586, 904 P.2d 1197].) "If an instruction relates 'particular facts to the elements of the offense charged,' . . . the court does not have a sua sponte duty to instruct. [Citation.]" (*People* v. *Middleton* (1997) 52 Cal.App.4th 19, 30 [60 Cal.Rptr.2d 366].) The court " ' ". . . need not instruct on its own motion on specific points developed at the trial." [Citation.]' [Citation.]" (*People* v. *Jenkins* (1994) 29 Cal.App.4th 287, 297 [34 Cal.Rptr.2d 483].)

■ A trial court also " 'has no sua sponte duty to give amplifying or clarifying instructions . . . where the terms used in the instructions given are "commonly understood by those familiar with the English language." [Citation.]' [Citation.]" (*People* v. *Richie* (1994) 28 Cal.App.4th 1347, 1360 [34 Cal.Rptr.2d 200].) Only where a term used in an instruction has a

---

[12]The trial court's instruction pursuant to CALJIC No. 9.72 was: " 'Lawful custodian' means a person, guardian, or public agency having a right to custody of a child. [¶] A 'right of custody' means the right to physical care, custody and control of a child pursuant to a custody order or operation of law. In the absence of a court order to the contrary, a parent loses his or her right of custody of the child to the other parent if the parent having the right to custody is dead, is unable or refuses to take the custody, or has abandoned his or her family."

specific or technical meaning peculiar to the law is a further explanatory instruction necessary. (*People* v. *Jimenez* (1995) 33 Cal.App.4th 54, 61-62 [39 Cal.Rptr.2d 12]; *People* v. *Hill* (1983) 141 Cal.App.3d 661, 668 [190 Cal.Rptr. 628].) If a word or phrase may be "commonly understood by those familiar with the English language and of ordinary intelligence" it need not be further defined by the court. (*People* v. *Tatman* (1993) 20 Cal.App.4th 1, 13 [24 Cal.Rptr.2d 480]; see also *People* v. *Cantrell* (1992) 7 Cal.App.4th 523, 543 [9 Cal.Rptr.2d 188]; *People* v. *Ordonez* (1991) 226 Cal.App.3d 1207, 1229-1230 [277 Cal.Rptr. 382].)

■ We agree with appellant that a supplementary instruction on "abandoned" was imperative to furnish the jury with an explanation of a term which did not have a commonly understood definition in the context of the present case. Both former section 279 and Family Code section 3010 define the right of custody for purposes of former section 278 to explicitly exclude a parent who has "abandoned" the child. The term "abandoned child" has a precise and accepted meaning in the law of child custody. The child custody standards enumerated in Family Code section 3010 are also intended to have consistency with those stated elsewhere in the Family Code, specifically in Family Code section 7822 for proceedings to declare a child free from parental custody and control on the ground of abandonment. (See Cal. Law Revision Com. com., 29D West's Ann. Fam. Code (1994 ed.) § 3010, p. 156.) As we have observed, in Family Code, section 7822, subdivision (a), a precise and technical definition of an "abandoned child" has been provided. Thus, the term "abandoned" is not used in its ordinary sense in child custody determinations, but rather refers to distinctive acts or omissions by a parent. The meaning of "abandonment" was also closely connected to the evidence presented on the issue of appellant's right of custody, and essential to the jury's understanding of the case. We therefore conclude that the trial court was required to define the technical term "abandoned" for the jury. (See *People* v. *Lara* (1996) 44 Cal.App.4th 102, 109 [51 Cal.Rptr.2d 402]; *People* v. *Thurmond* (1985) 175 Cal.App.3d 865, 872 [221 Cal.Rptr. 292].)

The instruction proposed by appellant was inappropriate, however. For the most part it was merely duplicative of the CALJIC No. 9.72 instruction. The instruction was also argumentative and legally incorrect in several respects. The blanket statement that a parent with the right of custody cannot be found to violate the law "in the absence of a lawful court order to the contrary" is simply incorrect. The single paragraph that attempted to describe "intent to abandon" did so in incomplete terms favorable to the defense. Otherwise, the instruction failed to provide the jury with any further functional definition of

"abandoned" than is found in the CALJIC No. 9.72 instruction. The court did not err in declining to give appellant's "right of custody" instruction.

Instead, we are persuaded that the definition of "abandoned" for purposes of determining loss of a parent's right of custody in dependency and other family law proceedings, is also appropriate and must be given as part of the right of custody instructions in cases where a parent has been charged with abduction pursuant to former section 278, and loss of the right of custody by abandonment of the child has been placed in issue by the evidence. An instruction that defines "abandoned" generally as " 'an actual desertion, accompanied with an intention to entirely sever, so far as it is possible to do so, the parental relation and throw off all obligations growing out of the same,' " must be given. (*In re Daniel M., supra,* 16 Cal.App.4th at p. 882; *Adoption of Michael D., supra,* 209 Cal.App.3d at p. 136.) The statutory definition of "abandoned" in Family Code section 7822, subdivision (a), must be added to the instruction.[13] An instruction on intent to abandon is also necessary.

The trial court's failure to furnish the jury with an instructional definition of the term "abandoned" was error. The remaining issue is whether the error was prejudicial, and we conclude that it was not. The error is not reversible per se. (*People* v. *Flood* (1998) 18 Cal.4th 470, 487-490 [76 Cal.Rptr.2d 180, 957 P.2d 869]; *People* v. *Miller* (1999) 69 Cal.App.4th 190, 208-209 [81 Cal.Rptr.2d 410].) ▪ Rather, "[a]n instruction that omits a required definition of or misdescribes an element of an offense is harmless only if 'it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." ' [Citation.] 'To say that an error did not contribute to the verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' [Citation.]" (*People* v. *Mayfield* (1997) 14 Cal.4th 668, 774 [60 Cal.Rptr.2d 1, 928 P.2d 485]; see also *People* v. *Cortez* (1994) 30 Cal.App.4th 143, 167 [35 Cal.Rptr.2d 500]; *People* v. *Wilkins* (1993) 14 Cal.App.4th 761, 779 [17 Cal.Rptr.2d 743].) We must determine " '. . . whether the evidence eliminates any reasonable doubt that a defendant would have been convicted under proper instructions.' [Citation.]" (*People*

---

[13]Thus, the jury must be instructed pursuant to Family Code section 7822, subdivision (a) that a child is abandoned by a parent, where the child has been "left by both parents or the sole parent in the care and custody of another for a period of six months or by one parent in the care and custody of the other parent for a period of one year without any provision for the child's support, or without communication from the parent or parents, with the intent on the part of the parent or parents to abandon the child." The language of a statute is generally an appropriate and desirable basis for an instruction. (*People* v. *Estrada, supra,* 11 Cal.4th at p. 574; *People* v. *Poggi* (1988) 45 Cal.3d 306, 327 [246 Cal.Rptr. 886, 753 P.2d 1082].)

v. *Costa* (1991) 1 Cal.App.4th 1201, 1208 [2 Cal.Rptr.2d 720].) The evidence conclusively establishes that appellant abandoned his child under any definition of the term. Appellant also *refused* to take custody of Cleve, and thus lost his right of custody by an independent, alternative means under former section 279 and Family Code section 3010. We find the omission of a definition of "abandonment" harmless beyond a reasonable doubt.

Accordingly, the judgment is affirmed.

Strankman, P. J., and Marchiano, J., concurred.

A petition for a rehearing was denied January 11, 2000, and appellant's petition for review by the Supreme Court was denied March 29, 2000.