Filed 9/18/13  P. v. Ayyad CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION SIX

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>EZZAT AYYAD,<br><br>    Defendant and Appellant. | 2d Crim. No. B245507<br>(Super. Ct. No. 2009017255)<br>(Ventura County) |

The trial court, sitting without a jury, found Ezzat Ayyad guilty of one count of grand theft by defrauding a public housing authority.  (Pen. Code, § 487i.)[1]  The trial court also found true the special allegation that the taking was in excess of $50,000.  (§ 12022.6.)  We affirm.

### FACTS

The Ventura County Housing Authority (Housing Authority) administers Department of Housing and Urban Development (HUD) rent subsidies for low income families.  HUD provides regulations for the subsidies.

The amount of the subsidy is determined by the family's composition and all family income.  The client must report all changes to family, composition, income or

_____

[1] All statutory references are to the Penal Code unless otherwise stated.

assets within 10 days.  The head of household has to live in the home full time.  If the head of household is out of the home for more than 14 days, he or she must notify the Housing Authority in writing; if more than 30 days the Housing Authority must authorize the absence.  If someone is staying at the house two or three days a week, it should be reported.  If a head of household wanted to live 50 percent of the time in Egypt and 50 percent of the time in the United States, it would not be permitted.  Depending on the severity of the omissions or misinformation, a person could be terminated from the housing program.

Emtethal Harmina applied for rent subsidy voucher.  Because of language and other difficulties, the Housing Authority asked Harmina to execute a power of attorney so someone could act on her behalf.  Harmina appointed Ayyad as her attorney-in-fact.

Ayyad filled out Harmina's original application on August 13, 2002, and an annual recertification for the subsidy from 2003 to 2007.  The applications showed that Harmina, Ayyad, and Sarah, Ayyad's daughter and Harmina's granddaughter, were the only persons living in the house.  Ayyad disclosed only one checking account with a balance of between $300 to $400.

From 2002 to 2007, Ayyad failed to disclose:  that Harmina was living in Egypt at least 50 percent of the time; that Ayyad's ex-wife, Hanan Botros, was living in the home; that Botros had a substantial income; and that Ayyad was earning rental income.  In addition, Ayyad did not disclose on recertification forms that he had a Canadian bank account and that he held securities.

The parties stipulated that Botros earned income as an office manager for a doctor as follows:  in 2002 she earned $66,000; in 2003 she earned $93,479.50; in 2004 she earned $100,840; in 2005 she earned $107,322; in 2006 she earned $107,890.  Botros testified in 2007 she earned $5,800 biweekly.

Shirley Bumpus, a Housing Authority fraud investigator, testified that if she had discovered that Botros was living with Ayyad and that Harmina was living in Egypt,

2

the account would have been terminated. If Botros earned the stipulated salaries between 2003 and 2007, the account would have been terminated. The $66,000 Botros earned in 2002 might have disqualified them.

On April 17, 2007, a Housing Authority investigator interviewed Ayyad's daughter, Sarah, at her home. He interviewed her again a few days later at her school. Sarah was nine years old at the time. Sarah told the investigator that she lived with her mother and father her whole life. She said Harmina did not live with them. She was not sure how long Harmina had lived in Egypt, but she thought it was her whole life. She said Harmina had been visiting them for about two weeks and she thought Harmina had last visited about five years ago.

Special agent David Wales with Homeland Security performed a computerized search of Harmina's travel history from 2002 to 2007. The records show Harmina left the United States on November 23, 2002, and returned in January 2006. She left again in February 2006 and returned on March 28, 2007.

Ayyad's sister-in-law told a Housing Authority investigator that between 2000 and 2005 Harmina lived with Ayyad about 50 percent of the time.

A search warrant executed at the residence in April 2007 found evidence that Botros lived there. The evidence included financial papers, clothing, and toiletries. Investigators also found numerous documents showing Ayyad lived there. Investigators discovered only two beds in the residence. Sarah slept in one and someone slept with Ayyad in the master bedroom. When an investigator asked Botros about sleeping with Ayyad in the same bed she said, "[t]hat doesn't mean anything." Investigators found Harmina lying on a couch in the family room. A suitcase filled with clothes was right next to her.

Bumpus testified that the total housing benefits extended to Harmina from May 2003 through May 2007 was $62,662.59. The total received for the year beginning June 1, 2006, and ending May 31, 2007, was $16,880.

DISCUSSION

I.

Ayyad contends the one-year sentence enhancement imposed pursuant to section 12022.6, subdivision (a)(1) is not supported by substantial evidence.

At the time Ayyad was sentenced, section 12022.6, subdivision (a)(1) provided for a one-year sentence enhancement if the loss from taking property in the commission of a felony exceeds $50,000.[2]  Any money that the government would have been obligated to pay had the fraud not occurred is not included in calculating the $50,000.  (*People v. Crow* (1993) 6 Cal.4th 952, 961-962.)

In reviewing the sufficiency of the evidence we view the evidence in a light most favorable to the judgment.  (*People v. Johnson* (1980) 26 Cal.3d 557, 578.)  We discard evidence that does not support the judgment as having been rejected by the trier of fact for lack of sufficient verity.  (*People v. Ryan* (1999) 76 Cal.App.4th 1304, 1316.)  We have no power on appeal to reweigh the evidence or judge the credibility of witnesses.  (*People v. Stewart* (2000) 77 Cal.App.4th 785, 790.)  We must affirm if we determine that any rational trier of fact could find the elements of the crime or enhancement beyond a reasonable doubt.  (*People v. Johnson*, *supra*, at p. 578.)

Bumpus testified that the total amount of benefits extended from May 2003 through May 2007 was $62,662.59.  Of that amount, $16,880 was extended from June 1, 2006 to May 31, 2007.  Bumpus also testified that if Ayyad had disclosed how much Botros was making between 2003 and 2007, the account would have been terminated.

Ayyad points out that the parties stipulated to Botros's salary only through 2006.  He argues we must deduct the $16,880 paid in 2007 for lack of evidence as to what Botros was paid that year.  It is true the stipulation only went through 2006.  But Botros testified in 2007 she earned $5,800 biweekly as an officer manager, more than she

---

[2] The amount has been increased to $65,000.  The amendment is not retroactive.  (Stats. 2007, ch. 420, §§ 1 & 2.)

4

made in any other year. That is sufficient evidence to support the trial court's finding that Ayyad fraudulently obtained the entire $62,662.59.

Ayyad argues there is no substantial evidence Harmina was not living in the house in 2007. But the trial court could reasonably conclude from Bumpus's testimony that Botros's income alone would have terminated the account. Thus evidence that Harmina was not living in the house was not necessary.

In any event, Homeland Security records show that between February 23, 2002, and March 28, 2007, Harmina was in the United States for less than one month. In April 2007, when investigators searched the house, they found Harmina lying on a couch with her suitcase nearby. Investigators found only two beds in the house, one for Sarah and one for Ayyad and Botros. Sarah told an investigator that Harmina did not live with them, she just visited. A reasonable trier of fact could conclude Harmina was never anything more than a temporary visitor to the house.

## II.

Ayyad contends the sentencing enhancement is unauthorized because the aggregate loss did not arise from a common scheme or plan.

Section 12022.6, subdivision (b) allows the amount of the losses to be aggregated only where the amount "arise from a common scheme or plan." Here all the money was taken from the same victim, the Housing Authority, by the same method, false statements made in voucher applications, and for the same purpose, to obtain housing vouchers. That is more than ample evidence to support the trial court's finding of a common scheme or plan.

Ayyad's reliance on *People v. Bailey* (1961) 55 Cal.2d 514, is misplaced. There, the defendant was charged with theft of county welfare funds under false pretenses. He received a total of $3,064, in installments of less than $200 each. The court instructed the jury: "[I]f several acts of taking are done pursuant to an initial design to obtain from the owner property having a value exceeding $200 and if the value of the property taken exceeds $200, there is one crime of grand theft, but that if there is no such

initial design, the taking of any property having a value not exceeding $200 is petty theft." (*Id.* at p. 518.) The jury found the defendant guilty of grand theft. Our Supreme Court determined the jury was properly instructed, and reversed the trial court's grant of a new trial.

Here the trial court could reasonably conclude Ayyad's initial plan was to take as much as he could get. He did not stop on his own; he only stopped when he got caught. Thus Ayyad's initial plan encompassed the entire $62,662.59. If anything, *Bailey* supports the trial court's determination here that the amounts received by Ayyad should be aggregated.

Ayyad's reliance on *People v. Sanford* (1940) 16 Cal.2d 247, and *People v. Rabe* (1927) 202 Cal. 409, is also misplaced. In both cases our Supreme Court upheld the trier of fact's finding that multiple acts of theft were separate and thus supported multiple convictions.

Here, as in the cases relied on by Ayyad, we affirm the trier of fact's determination, as supported by substantial evidence.

The judgment is affirmed.

NOT TO BE PUBLISHED.


GILBERT, P. J.

We concur:


YEGAN, J.


PERREN, J.


6

Bruce A. Young, Judge

Superior Court County of Ventura

_____

William Paul Melcher, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, Pamela C. Hamanaka, Deputy Attorney General, for Plaintiff and Respondent.