Filed 11/13/14  P. v. Ogura CA2/6
Opinion following remand from Supreme Court
## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>KARL KATSUMI OGURA et al.,<br><br>    Defendants and Appellants. | 2d Crim. No. B239122<br>(Super. Ct. No. KA089210)<br>(Los Angeles County)<br><br>OPINION ON REMAND |

A jury found Christopher D. Hernandez guilty of (count 1) first degree murder (Pen. Code, § 187, subd. (a); 189) and (count 2) dissuading a witness (§ 136.1, subd. (b)).[1]  As to both counts, the jury found Hernandez personally used a dangerous or deadly weapon.  (§ 12022, subd. (b)(1).)  The jury also found true that the offenses were committed for the benefit of, at the direction of, or in association with, a criminal street gang.  (§ 186.22, subd. (b)(1)(C).)

On count 1, the trial court sentenced Hernandez to 25 years to life plus a consecutive one-year term for the section 12022, subdivision (b)(1) weapons

_____

[1] All statutory references are to the Penal Code unless stated otherwise.

enhancement. The court also imposed and stayed a 10-year term on the section 186.22, subdivision (b)(1)(C) gang enhancement. The court did not impose a 10-year gang enhancement pursuant to section 186.22, subdivision (b)(1)(C) for count 2, but the abstract of judgment shows one. Finally, the court imposed a $240 restitution fine.

The jury found codefendant Karl Katsumi Ogura guilty of first degree murder and found the gang enhancement allegation true. The court sentenced Ogura to 25 years to life for the murder and a consecutive 10-year term for the gang allegation. The court also imposed a $240 restitution fine.

Originally, we affirmed Ogura's first degree murder conviction as an aider and abettor under the natural and probable consequences doctrine. After we filed our opinion, our Supreme Court decided *People v. Chiu* (2014) 59 Cal.4th 159. On Ogura's petition for review, our Supreme Court remanded the matter to us to decide in light of *Chiu*. We conclude *Chiu* compels us to remand Ogura's first degree murder conviction to allow the People to accept a reduction of the conviction to second degree murder or retry Ogura for first degree murder under the appropriate theory.

We modify the judgment as follows: Ogura's conviction for first degree murder is reduce to second degree murder and his sentence reduced to 15 years to life. Hernandez's sentence on count 2, dissuading a witness, is reduced to seven years to life; all sentences imposed pursuant to section 186.22, subdivision (b)(2)(C) are stricken; and the restitution fines imposed on Hernandez and Ogura are reduced to $200 each. In all other respects, we affirm.

FACTS

On December 31, 2009, Javier Rodriguez was hosting a New Year's Eve party at his home. Attending the party were Silvia Galvez, the mother of Hernandez's two children. Also attending were the children and Michael Espana.

Hernandez was across the street attending a gathering at his uncle's house. Hernandez and Galvez were estranged. When Hernandez saw Galvez, he asked if he could see his children. Galvez said "No," because Hernandez was drunk.

2

Hernandez was wearing a shirt with a picture of an owl and the words, "Night Owl." The night owl is a symbol of the Basset gang.

After midnight, Espana decided to walk home, about a half mile away. Espana was drunk and Rodriguez wanted to drive him home. Espana refused Rodriguez's offer and began to walk. Rodriguez walked with him. As they walked, the two men argued loudly about Rodriguez driving Espana home.

Hernandez and Ogura were standing in the driveway of Hernandez's uncle's home when Espana and Rodriguez walked by, still arguing. Rodriguez knew Hernandez because of Hernandez's prior relationship with Galvez. Rodriguez had seen Ogura in the neighborhood a couple of months prior, but they had not spoken.

Hernandez made eye contact with Espana. Hernandez approached Espana and said, "What are you saying?" Rodriguez told Hernandez that Espana is drunk and he is trying to get him home. Hernandez replied, "Fuck that fool," and "He shouldn't be disrespecting me." Hernandez said, "You don't know who I am; I'm Bassett."

Hernandez began punching Espana. Espana tried to punch back, but he had a large bandaged cut on his right hand. None of the punches Espana attempted with his left hand hit Hernandez. Ogura got into the fight and began punching Espana. Both men hit and kicked Espana as he fell to the ground.

Rodriguez pulled Ogura off Espana. As Rodriguez was pulling Ogura off, Hernandez pulled a knife from his waist band. He began stabbing Espana. Rodriguez let go of Ogura to grab Hernandez. Ogura was about three feet away from Hernandez. Rodriguez grabbed Hernandez from behind and pulled him to the ground. Rodriguez was cut in the process. Espana began to walk away, but he collapsed.

As Espana walked away, Hernandez turned to Rodriguez and said, "[Y]ou better fuckin' take care of this, because if you don't, I'm going to take care of you and your family." Rodriguez took that to mean "don't call the police" and "don't make anything of it," "don't make it bigger," or "something [bad] would happen to me and my family." Espana later died of his wounds.

3

Ogura told Hernandez, "Let's get the fuck out of here.  Let's go.  Let's go.  Come on, man."  Hernandez drove away with Ogura in the passenger seat.

*Gang Evidence*

Los Angeles County Sheriff's Detective Gerald Groenow testified as a gang expert.  Both Hernandez and Ogura are members of the Bassett gang.  Hernandez has a "Barrio Bassett Grande" tattoo on his hand.  Ogura has a "Bassett" tattoo on the lower part of his neck.  Ogura's gang moniker is "Cheater."  The gang is also known as "Los Night Owls."  Owls are their symbol.  The gang has approximately 325 members.  Espana was killed in Bassett territory.  The primary activities of the gang are vandalism, murder, robbery, shootings and assaults.

Galvez told Groenow that Hernandez attacked Espana because he thought Espana was giving him a dirty look known as "mad dogging."  Galvez said, in response to the perceived mad dogging, Hernandez declared he is from Bassett and this is his neighborhood.

Groenow testified that respect is important to gangs because they operate on fear and intimidation.  If a gang member allows himself to be disrespected, he will appear weak.  Mad dogging is a sign of disrespect.  The response can range from a beating to murder.  If another gang member is present, he will be expected to join in the response.  Groenow opined that under the circumstance, the instant stabbing was committed for the benefit of the gang because it caused fear and intimidation in the area.

*DEFENSE*

Hernandez testified that he joined the Basset gang at age 16 and became a full member at age 17 or 18.  He committed crimes for the gang such as stealing cars.

On the evening of December 31, 2009, Hernandez was at his uncle's house.  He saw Ogura there earlier that day, but he did not meet him until that evening.  Ogura introduced himself as Karl.

Hernandez left his uncle's house shortly after midnight.  He was walking to his car when hear someone say, "Well, what's up then, mother fucker?"  He turned

4

and saw Espana and Rodriguez.  Espana took two steps toward Hernandez and Hernandez walked toward him.  Espana threw the first punch and Hernandez responded with a punch.  They began "grappling" with each other.

Hernandez did not land any punches, but he felt hits to the back of his head, back and shoulders.  He instinctively covered his head with his hands.  Then he felt someone try to take him to the ground.  He was afraid of being "stomped out" and killed.  He was in fear for his life.

Hernandez carries a knife in a sheath on his belt.  He uses the knife in his construction work.  He took the knife from the sheath and swung it in front of him.  He did not intend to stab anybody.  He only wanted to get people away from him.

Espana walked away.  Hernandez told Rodriguez that he needs to take care of Espana.  Rodriguez replied, "Hey, I'm sorry.  He's drunk."  Hernandez did not realize that Espana was badly hurt.  Ogura asked Hernandez for a ride and they left together.  Hernandez turned himself in when he heard the police were looking for him.

Hernandez left the Basset gang when he was 18 years old.  He moved out of his mother's house, which was in Bassett territory, and stayed in a motel.  When Hernandez was in prison in 2006, Bassett gang members recognized him.  They wanted him to get a gang tattoo, so he did.  Had he not reaffiliated with the gang, he would have been jumped, stabbed or harmed in some way.  He did not have the tattoo removed after he left prison because he was afraid he would run into other gang members on the street.

Hernandez denied that he was wearing a shirt with a picture of an owl on it or that he claimed to be a member of the Basset gang on the night of the fight.

Abel Garcia testified as a gang expert.  Garcia is a member of the El Monte Flores gang, a rival to the Basset gang.  He has known Hernandez since 2009, when he rented a room from Hernandez's father.  Based on Hernandez's lifestyle, Garcia believes he is no longer a member of a gang.  While in prison, Hernandez had no choice but to get back into the gang.  In prison, gang tattoos are required to show loyalty.

5

Garcia testified that if a civilian disrespects a gang member, the gang member is likely to let it go. These situations do not benefit the gang. In Garcia's opinion a person committing a stabbing under the circumstances of this case would not be engaging in gang-related behavior.

Ogura did not testify or present any affirmative evidence on his behalf.

DISCUSSION

I.

Ogura contends his murder conviction and the gang allegation are not supported by substantial evidence.

In reviewing the sufficiency of the evidence we view the evidence in a light most favorable to the judgment. (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) We discard evidence that does not support the judgment as having been rejected by the trier of fact for lack of sufficient verity. (*People v. Ryan* (1999) 76 Cal.App.4th 1304, 1316.) We have no power on appeal to reweigh the evidence or judge the credibility of witnesses. (*People v. Stewart* (2000) 77 Cal.App.4th 785, 790.) We must affirm if we determine that any rational trier of fact could find the elements of the crime or enhancement beyond a reasonable doubt. (*People v. Johnson*, *supra*, at p. 578.)

Ogura was convicted of murder as an aider and abettor. An aider and abettor is guilty not only of the crime he intends to commit, but also of any other offense that is the "natural and probable consequence" of the crime aided and abetted. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) The question whether an offense is the natural and probable consequence does not depend on the defendant's subjective state of mind. (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 531.) Instead, it depends on whether a reasonable person in defendant's position should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted by the defendant. (*Ibid.*) A reasonably foreseeable consequence need not have a strong probability; it is sufficient that it is a possible consequence that might reasonably have been contemplated. (*Id.* at p. 535.) In the gang context, it is not necessary for there to have been a prior discussion or agreement to a stabbing, or for a

gang member to have known a fellow gang member was in fact armed. (*People v. Medina* (2009) 46 Cal.4th 913, 924.)

Immediately prior to the fight Hernandez said, "[Espana ] shouldn't be disrespecting me," and "You don't know who I am; I'm Bassett." Shortly thereafter Ogura, a fellow Basset gang member, joined Hernandez in punching Espana. Detective Groenow testified respect is important to gangs; a gang's response to disrespect can include murder; a fellow gang member is expected to join in the response; and one of the Basset gang primary activities is murder. Finally, Hernandez and Ogura fled together after the stabbing.

The jury could conclude that the assault on Espana was a gang activity in which Ogura joined, and that murder was a reasonably foreseeable consequence.

Ogura argues there is no evidence Ogura knew at the time of the fight that Hernandez was a fellow Basset gang member. But Hernandez and Ogura were at the same party in Bassett territory. Hernandez was wearing a shirt with a picture of an owl on it. An owl is a symbol of the Basset gang. Hernandez has a tattoo "Barrio Bassett Grande" on his hand. Prior to the fight Hernandez declared in Ogura's presence, "I'm Bassett." Ogura would have to have been insensate not to know Hernandez was a fellow member of the Basset gang.

For similar reasons, Ogura's contention that there is no evidence the murder was committed for the benefit of a criminal street gang must fail.

Detective Groenow testified that street gangs operate on fear and intimidation. They cannot afford not to retaliate for being disrespected. It makes them look weak. Retaliation can include beatings and murder. Other members of the gang are expected to join in the retaliation. There is evidence Hernandez felt disrespected by Espana. Hernandez declared his membership in Bassett prior to the assault. The assault was in retaliation for the disrespect. Ogura, as a fellow gang member, joined in the retaliation, as he was expected to do. The gang was benefitted because its reputation was preserved or even enhanced.

7

Ogura contends his murder conviction must be reduced to second degree.

In *People v. Chiu*, *supra*, 59 Cal.4th 155, a jury found Chiu guilty of first degree, willful, deliberate and premeditated murder (premeditated murder). Chiu was involved in a fist fight between two groups during which one of his associates obtained a gun and killed an opposing combatant. One witness testified Chiu told his associate to "'[g]rab the gun'" and yelled "'shoot him, shoot him.'" (*Id.*, at p. 160.) But Chiu denied he called for anyone to grab a gun, nor did he want or expect anyone to be shot. Chiu was charged with first degree murder as an aider and abettor. The trial court instructed the jury that it could find Chiu guilty of first degree murder if it found either that he directly aided and abetted the murder, or that he aided and abetted the target offense of assault or disturbing the peace, the natural and probable consequence of which was murder.

Our Supreme Court held it was error to instruct the jury that a defendant could be guilty of first degree premeditated murder under the natural and probable consequences doctrine. The Court stated: "[T]he connection between the defendant's culpability and the perpetrator's premeditative state is too attenuated to impose aider and abettor liability for first degree murder under the natural and probable consequences doctrine . . . . [¶] Accordingly, we hold that punishment for second degree murder is commensurate with a defendant's culpability for aiding and abetting a target crime that would naturally, probably, and foreseeably result in a murder under the natural and probable consequences doctrine. We further hold that where the direct perpetrator is guilty of first degree premeditated murder, the legitimate public policy considerations of deterrence and culpability would not be served by allowing a defendant to be convicted of that greater offense under the natural and probable consequences doctrine." (*People v. Chiu*, *supra*, 59 Cal.4th at p. 166.)

The Court made clear that aiders and abettors may still be convicted of first degree premeditated murder based on direct aiding and abetting principles. (*People v. Chiu*, *supra*, 59 Cal.4th at p. 166.) But the Court determined there was no

8

basis in the record to conclude the verdict was based on the legally-valid theory of direct aiding and abetting. (*Id.*, at p. 168.) The Court allowed the People to accept a reduction of the conviction to second degree murder or to retry the greater offense. We allow the People the same option.

## III.

Hernandez contends the special allegation that he personally used a knife in the commission of count 2, dissuading a witness is not supported by the evidence. (§ 136.1, subd. (b)(2).)

Section 12022, subdivision (b)(1) provides for a one-year sentence enhancement for a defendant who personally uses a deadly or dangerous weapon in the commission of a felony. A defendant uses a weapon when he displays it in order to facilitate the commission of a crime. (*People v. Granado* (1996) 49 Cal.App.4th 317, 325.). No harm is required, only fear of harm. (*People v. Masbruch* (1996) 13 Cal.4th 1001, 1011.)

Here Hernandez used a knife to stab Espana and cut Rodriguez. Immediately thereafter, Hernandez threatened Rodriguez, "[Y]ou better fuckin' take care of this, because if you don't, I'm going to take care of you and your family." Rodriguez understood Hernandez to mean he better not "make anything" of the stabbing. Because Hernandez made the threat immediately after the fight, the jury could conclude that he was still holding the knife when he made the threat. That is sufficient to support a true finding of personal use of a deadly weapon in dissuading a witness.

## IV.

Ogura contends the trial court violated his Sixth Amendment right to confront witnesses by admitting recordings of conversations between Hernandez and Hernandez's father.

Over Ogura's confrontation clause objection, the trial court admitted a conversation between Hernandez and his father recorded when Hernandez was in jail:

"[FATHER]: Okay no, you know they got what's his name, Cheater.

"[HERNANDEZ]: They got him?

"[FATHER]: Yeah. Okay, so he's going to say his [sic].

"[HERNANDEZ]: So I'm going to be going to court with him then huh?

"[FATHER]: Yeah, you're going to be going to court. There's two of you guys on it now. Both for 187.

"[HERNANDEZ]: All right.

"[FATHER]: Okay. So you know what, so we already know what he's gonna say.

"[HERNANDEZ]: Yeah.

"[FATHER]: Okay. We talked, we talked to him.

"[HERNANDEZ]: All right.

"[FATHER]: Okay. He's gonna do with that same, with the truth.

"[HERNANDEZ]: All right. How did they get him?

"[FATHER]: Huh?

"[HERNANDEZ]: How did they get him?

"[FATHER]: I don't know."

The conversation was admitted to show that Hernandez, who had been in jail since January 4, 2010, knew Ogura by his gang moniker. The prosecution argued it is relevant to show Hernandez knew Ogura was a fellow gang member prior to the fight.

The Sixth Amendment Confrontation Clause of the United States Constitution prohibits the admission of testimonial statements. (*Crawford v. Washington* (2004) 541 U.S. 36.) In order to qualify as "testimonial," the statement must be made with some formality and for the primary purpose of establishing facts for possible use at a criminal trial. (*People v. Garcia* (2008) 168 Cal.App.4th 261, 291.) An informal statement made in an unstructured setting generally does not

10

constitute a testimonial statement. (*Ibid.*) The informal conversation between Hernandez and his father is not testimonial. The Confrontation Clause is not implicated.

The conversation was not introduced for the truth of the matter stated, but only to impeach Hernandez's testimony that he did not know Ogura well. Thus it is not hearsay. (Evid. Code, § 1200, subd. (a).)

Moreover, the trial court instructed the jury that it could only consider the evidence against Hernandez. We presume the jury understood and followed the trial court's instructions. (*People v. Butler* (2009) 46 Cal.4th 847, 873.) Ogura points to nothing in the record that would rebut the presumption.

Nor does Ogura point to anything in the record to support his assertion that the jury found him guilty by association. As we have previously discussed, there is more than ample evidence in support of Ogura's conviction standing on its own.

V.

Ogura contends the trial court erred in giving a modified version of CALCRIM Nos. 358 and 361.

*(a)*

The trial court gave a modified version of CALCRIM No. 358, as follows: "You have heard evidence that the defendants made oral statements before the trial. You must decide whether a defendant made any of these statements, in whole or in part. If you decide that the defendant made such statements, consider the statements, along with all the other evidence, in reaching your verdict. It is up to you to decide how much importance to give to the statements. [¶] Consider with caution any statement made by a defendant tending to show his guilt unless the statement was written or otherwise recorded."

Ogura argues the reference to the plural "defendants" making pretrial statement is misleading because there was no evidence Ogura made any such statements. He claims the instruction would invite the jury to consider the recorded conversation between Hernandez and his father in determining Ogura's guilt. He

11

claims the second paragraph invites the jury to give greater weight to the purported statements by Ogura referenced during the conversation because the conversation was recorded.

Ogura's argument has two flaws. First, Hernandez was not the only defendant who made a pretrial statement. There was evidence that after the fight Ogura told Hernandez, "Let's go. Let's go. Come on, man." Second, the jury would not have considered the recorded conversation in determining Ogura's guilt because it was specifically instructed not to.

*(b)*

On cross-examination, the prosecutor asked Hernandez for the name of the person who gave him the gang tattoo in prison. Hernandez refused to provide the name, citing fear for his safety. The trial court ordered him to answer and warned him the jury would be instructed it could consider his refusal to answer as relevant to his guilt. Hernandez still refused to answer.

The trial court instructed with a modified version of CALCRIM No. 361, as follows: "If defendant Christopher Hernandez failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt. [¶] If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

Ogura complains that the instruction fails to identify Hernandez as the only defendant against whom the failure to explain or deny could be considered. The instruction expressly refers to what Hernandez did in his testimony. Ogura did not testify. The jury could not have been confused by the instruction.

Hernandez also contends it was error for the trial court to give CALCRIM No. 361. He points out that the instruction should only be given where the failure to explain or deny relates to some matter of significance. (Citing *People v.*

12

*Haynes* (1983) 148 Cal.App.3d 1117, 1119-1120.) He claims the name of the person who told him to get a tattoo is at best tangential to the issues in this case. But a substantial issue in the case is whether Hernandez was still an active Basset gang member. His refusal to name the gang member who told him to get a tattoo is probative of his continuing gang membership. It was not error to give the instruction.

VI.

Ogura contends the trial court erred in failing to modify CALCRIM No. 571 to apply to each defendant separately.

CALCRIM No. 571 as given by the trial court states in part: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendants killed a person because they acted in imperfect self-defense or imperfect defense of another. [¶] If you conclude the defendants acted in complete self-defense of another, their action was lawful and you must find them not guilty of any crime. The difference between complete self-defense or defense of another and imperfect self-defense or imperfect defense of another depends on whether the defendants' belief in the need to use deadly force was reasonable. [¶] A defendant acted in imperfect self-defense or imperfect defense of another if: [¶] 1. The defendant actually believed that he or another was in imminent danger of being killed or suffering great bodily injury; [¶] AND [¶] 2. The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger; [¶] BUT [¶] 3. At least one of those beliefs was unreasonable."

Ogura argues the instruction forces the jury to consider Ogura's belief and Hernandez's belief to be the same. He points out that the jury must consider Ogura's state of mind for imperfect self-defense independently of Hernandez's state of mind.

Ogura did not object or offer any clarifying instruction. He may not now raise the argument on appeal. (See *People v. Parson* (2008) 44 Cal.4th 332, 352.)

In any event, any error in the instruction is harmless by any standard. The People's evidence is that Hernandez initiated the fight; Espana had only one hand

13

to fight with; and Espana was not landing any blows on Hernandez when Ogura joined in. The only defense evidence of either defendant's state of mind is Hernandez's testimony that he felt in fear for his life. The jury did not believe him. Ogura did not testify. Having found Hernandez was not in fear for his life, there was no basis for the jury to conclude Ogura held a belief in the need to defend Hernandez.

VII.

Ogura and Hernandez contend the trial court erred in instructing with CALCRIM No. 372.

The court instructed with CALCRIM No. 372, as follows: "If a defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that a defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself."

Hernandez argues the primary question for the jury was his state of mind when he stabbed Espana. He claims his flight was not relevant to that issue. But our Supreme Court has rejected that challenge to the instruction. (*People v. Mendoza* (2000) 24 Cal.4th 140, 180-181.) For example, flight can be relevant to a defendant's good faith belief in the need for self-defense. If the defendant believed he acted in self-defense he would not have fled. Our Supreme Court also rejected Hernandez's argument that the instruction created the risk that the jury would give the evidence undue weight. (*Ibid.* [flight instruction not improper pinpoint and not argumentative].) The instruction expressly states: "[I]t is up to you to decide the meaning and importance of that conduct." (CALCRIM No. 372.)

Ogura argues that CALCRIM No. 372 is only proper where the evidence is "sufficient to support a claim of unbroken inferences from the defendant's behavior to the defendant's guilt of the crime charged. [Citation.]" (*U.S. v. Silverman* (9th Cir. 1988) 861 F.2d 571, 581.) But that test is met here. As we have stated, the jury could draw the inference from the defendants' flight that they had no good faith belief in the need for self-defense. That directly relates to the charged offense of murder.

14

Both defendants point out that there may be explanations for leaving the scene other than a consciousness of guilt. But it is irrelevant that there may be other explanations. The prosecution is only required to present evidence from which a jury *could* find the defendant fled and permissibly infer a consciousness of guilt from the evidence. (*People v. Bonilla* (2007) 41 Cal.4th 313, 328.) Here there is ample evidence to support the instruction.

## VIII.

Ogura contends that he received ineffective assistance of counsel to the extent counsel failed to object to an error in the instructions.

But ineffective assistance of counsel requires a showing of prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) The only possible error in failing to object may have been to the form of CALCRIM No. 51. As we have stated, there was no prejudice.

Ogura claims cumulative error requires reversal. But there was no cumulative error.

## IX.

The People concede the trial court made errors in determining both Hernandez's and Ogura's sentences.

### (a)

The trial court sentenced Hernandez to a consecutive term of 15 years to life on count 2, dissuading a witness. Section 186.22, subdivision (b)(4)(C) provides for a term of seven years to life as a gang enhancement for threats to victims or witnesses as defined in section 136.1. The minimum term for count 2 must be reduced from 15 to 7.

### (b)

The trial court imposed and stayed on each defendants' 25 years to life sentence a 10-year determinate gang enhancement pursuant to section 186.22, subdivision (b)(1)(C). Subdivision (b)(1) of that section applies, "[e]xcept as provided in paragraph . . . (5)." Paragraph (5) provides that where a prisoner is sentenced to a

15

life term he shall not be paroled until a minimum of 15 years have been served.  (*Id.*, subd. (b)(5).)

Section 186.22, subdivision (b) provides alternative methods for punishing felons whose crimes were committed for the benefit of a criminal street gang.  (*People v. Lopez* (2005) 34 Cal.4th 1002, 1004.)  The People acknowledge that because paragraph (5) applies, the gang enhancement imposed under section 186.22, subdivision (b)(1)(C) must be stricken.  (*People v. Lopez*, *supra*, at pp. 1009, 1011.)  Instead, the greater 25 years to life term applies.

Hernandez also points out that although the court did not impose a section 186.22, subdivision (b)(1)(C) enhancement for count 2, the abstract of judgment shows that the enhancement was imposed and stayed.  The abstract of judgment must be corrected to eliminate the section 186.22, subdivision (b)(1)(C) enhancement.

*(c)*

The trial court imposed a $240 restitution fine on each defendant. (§§ 1202.4, 1202.45.)  The People concede that at the time of the offense the fine was $200.  The fine must be reduced to $200 for each defendant.

DISPOSITION

Ogura's conviction for first degree murder is reversed and remanded. The People may choose to accept a reduction to second degree murder or retry Ogura for first degree murder under the appropriate theory.  If the People do not elect within 30 days of the date of the remittiturs to retry Ogura, the offense shall be reduced to second degree murder.  Hernandez's sentence on count 2, dissuading a witness in violation of section 136.1, is reduced from a consecutive 15 years to life to a consecutive 7 years to life; all sentences imposed on Hernandez and Ogura pursuant to section 186.22, subdivision (b)(1)(C) are stricken; and the restitution fine for each defendant is reduced from $240 to $200.  The trial court shall prepare an amended abstract of judgment accordingly and transmit a certified copy of the amended abstract

16

of judgment to the Department of Corrections and Rehabilitation.  As modified, the judgment is affirmed.

<u>NOT TO BE PUBLISHED.</u>


GILBERT, P. J.


We concur:


YEGAN, J.


PERREN, J.

Mike Camacho, Judge

Superior Court County of Los Angeles
_____

Sharon Fleming, under appointment by the Court of Appeal, for Defendant and Appellant Christopher D. Hernandez.

Susan K. Shaler, under appointment by the Court of Appeal, for Defendant and Appellant Karl Katsumi Ogura.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson, Supervising Deputy Attorney General, Erika D. Jackson, Deputy Attorney General, for Plaintiff and Respondent.