Filed 10/24/25  P. v. Flores CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>PAUL RUBEN FLORES,<br><br>    Defendant and Appellant. | 2d Crim. No. B329873<br>(Super. Ct. No. 22CR003712)<br>(Monterey County) |

Paul Ruben Flores was charged with first degree murder committed during a rape or attempted rape.  (Pen. Code,[1] §§ 187, subd. (a); 189, subd. (a).)  The jury found him guilty as charged.  The trial court sentenced him to 25 years to life.  We affirm.

FACTS

Kristin Smart and Flores were freshmen at California Polytechnic University, San Luis Obispo (Cal Poly) in the fall of 1995.  Smart lived on the first floor of the Muir Hall dormitory in

---

[1] All statutory references are to the Penal Code unless otherwise stated.

room 120.  Flores lived on the first floor of the Santa Lucia dormitory in room 128.

In May of 1996, Smart's friends began to notice that Flores was showing a romantic interest in her.  The friends reported that on a number of occasions they saw Flores staring intently at her.  The friends thought it was creepy.  Although Flores lived in a different dormitory, he spent time in the common area of Smart's dormitory for no apparent reason.  It made Smart uncomfortable that Flores was following her.  Smart never showed any interest in Flores.  She viewed him as strange and creepy.

*The Party*

On Friday, May 24, 1996, Smart attended a party at a house on Crandall Avenue near the Cal Poly campus.  Flores was also there.  In two separate instances, Flores approached men, including Trevor Boelter, at the party with whom he had seen Smart talking, and inquired about her.

Trevor Boelter was a junior at Cal Poly in the fall of 1995.  He attended the same party as Smart.  At one point, during the party, Smart pulled Boelter into the bathroom and expressed an interest in a friend of his.  After a brief discussion, Boelter left the bathroom.  Immediately after Boelter left the bathroom, Flores came up to him and asked what he did with Smart in the bathroom.  Flores said it with authority, leading Boelter to think Flores was her boyfriend.  Boelter told Flores nothing happened.  Flores laughed and seemed relieved.

Boelter had two more encounters with Smart at the party.  She seemed not stable on her feet.  He said she "didn't seem like drunk.  It just seemed like, I don't know, druggie, like just kind of, like, out of it, really spacey."

*Smart Disappears*

Later, people leaving the party saw Smart lying on the ground in front of the house. She appeared to be under the influence of drugs or alcohol and was semiconscious. They offered help, but Smart refused.

At about 1:30 to 2:00 a.m., Cheryl Anderson and Timothy Davis left the party and saw Smart lying on the ground. They helped Smart to her feet and began walking her to the dormitories. She was very intoxicated and needed Davis to support her. Flores suddenly appeared and said he would walk back to the dormitories with them.

Davis assisted Smart until the group got to his dormitory. Davis left the group, and Flores took over supporting Smart. Flores helped Smart for a short distance before stopping and rubbing her arm. Smart did not respond. Flores encouraged Anderson to continue walking without them. Anderson refused because she did not want to walk alone. The three resumed walking before Flores stopped again. This time he hugged Smart. Smart did not respond. Flores again encouraged Anderson to proceed alone, but Anderson refused.

When they approached Anderson's dormitory, Anderson made Flores promise that he would take Smart home. Flores asked Anderson for a kiss. She refused. Then he asked Anderson for a hug. She refused. Anderson again made Flores promise that he would take Smart safely to her room. Anderson left Flores and Smart. That was the last time anyone but Flores saw Smart.

The next morning, Smart's roommate noticed that Smart's bed had not been slept in. In addition, the room contained

Smart's personal effects, like makeup and a hairbrush, that she would not have left behind had she gone on a trip.

*A Black Eye and Strange Responses*

On the Sunday after the party, a friend noticed Flores had a black eye.  When the friend asked about it, Flores replied that he woke up with it.  The next day another friend saw Flores wearing a baseball cap pulled down unnaturally low.  In spite of the cap, the friend noticed Flores had a black eye.  When the friend inquired, Flores said he had been pushed at a party.

Flores's roommate had gone home to Oakland the weekend when Smart disappeared.  When the roommate returned, he had heard about Smart's disappearance.  Flores acknowledged he was the last one to see her.  Flores's roommate joked that Flores had probably done something.  Flores's demeanor became serious, and he said, "She's at my house, eating lunch with my mom."

About a week later, Flores attended a high school graduation party.  Karen Hall, whose son was graduating, used a video camera to record conversations with her son's friends.  With the camera recording, Hall asked Flores if he would be graduating from Cal Poly in four years.  Flores answered, "no way."  The conversation turned to Smart.  Hall asked Flores, "What'd you do with her?"  Flores responded, "nothing," as he lowered his head and resumed eating.

*Police Interviews*

San Luis Obispo Police Officer Robert Cudworth interviewed Flores on May 28, 1996.  Flores said he had not spoken with Smart at the party before he walked her back to the dormitories.  He acknowledged he was left alone with Smart after Davis and Anderson departed.  Flores said he subsequently

4

separated from Smart. He denied he had been romantically interested in her.

Detective Lawrence Kennedy interviewed Flores later the same day and again on May 30, 1996. During the initial interview, Flores seemed very nervous. Flores explained his nervousness by telling Kennedy he thought he was being arrested on a traffic warrant. Kennedy asked about the black eye. Flores said he got it while playing basketball.

Flores told Kennedy that he did not really know Smart prior to the party. Flores acknowledged that he helped her walk home and gave her two hugs during the walk. Flores said he did not find her attractive. Flores said he parted with Smart because they lived in different dormitories.

Flores said he had too much to drink that night and vomited as soon as he got to his dormitory. He said he took a shower and went to bed at about 5:00 a.m. He said he saw a person in the bathroom but could not remember him.

On May 31, 1996, Flores was interviewed by two investigators from the district attorney's office. He said Smart approached him at the party, and they spoke briefly. She appeared to be intoxicated. Flores said he had no interest in Smart. When asked what he thought happened to Smart, he said she went off with someone and is no longer alive. Flores repeated his claim that he got a black eye while playing basketball.

In a subsequent interview with the investigators, Flores initially claimed that he did not know how he got a black eye; then he claimed that he got it while playing basketball; finally, he claimed he got it while working on his truck.

5

*Jennifer Hudson*

In the summer of 1996, Jennifer Hudson was 17 years old. One day that summer, she was sitting in a house where some of her friends were using a skateboard ramp. In the house with Hudson were Flores and a person Flores knew only as Red. A public service announcement came on the radio asking for information about Smart's disappearance. When the announcement ended, Flores said Smart was a "dick tease" and that he was tired of waiting for her. He said he buried her in Huasna, a rural town near Arroyo Grande, at his house under a skateboard ramp. When Flores made the statement, he did not appear to be intoxicated, his demeanor was cold and there was no suggestion he was attempting to be humorous. Hudson was "creeped out" and left the house minutes later.

Two weeks later, Hudson had a chance encounter with Flores. She drove some friends to a place where people like to skateboard. Flores approached her and asked if she would like to go "skinny dipping." Hudson vomited, closed her car door, and drove home. She did not call the police because she was afraid, especially because she was living on her own.

*Search With Dogs*

In June 1996, a search was conducted of Flores's dormitory with four dogs trained and certified in the detection of human remains.

Adela Morris unleashed one of her dogs on the first floor of Flores's dormitory. Morris had no information about whose dormitory it was or why she was conducting the search. Morris's dog provided an alert signal at room 128, Flores's room. When the door was opened, Morris's dog repeatedly gave an alert signal for the bed on Flores's side of the room. The dog had no interest

6

in the other side of the room. Morris released her dog in the hallway of all the floors in the dormitory. The dog did not give an alert signal for any other room. Morris repeated the search with a different dog. The same results pertained. The second dog gave an alert signal only for room 128 and only for Flores's side of the room.

Wayne Beharms conducted the same search with his dog with the same results. At that point, a detective took the mattress and box spring cover from Flores's bed. The box spring cover had a stain that tested positive for blood. DNA testing could neither include nor exclude Flores or Smart as a donor.

Finally, Gail La Rogue conducted a search with her dog. The dog also gave an alert at room 128 and at Flores's bed frame.

*Incidents at the Home of Flores's Father, Ruben Flores*

One day in the summer of 1996, Smart's father drove to the Flores family home. Smart's father got out of his car. Flores's father, Ruben,[2] met him in the street. Smart's father identified himself and said he wanted to talk. Ruben replied, "No, you ought to leave or someone might get shot."

Angie Carrizal dated Flores for about two years, starting in 2004. At some point in their relationship, they went to meet Ruben at his home. Carrizal went out the back door and stepped into the back yard. The demeanor of Flores and Ruben changed. They acted like they did not want her to be in the backyard. They quickly directed her to the front of the house. Ruben acted rudely toward her. Carrizal was never invited back.

David Stone rented a room from Ruben at his home from 2010 until 2020. At some point, a plumber came to the house to

---

[2] References to Ruben Flores by his first name is for purposes of clarity only.

fix a leak.  When the plumber told Ruben he would have to go under the deck, Ruben refused to let him.  Stone believed Flores fixed the leak.  Ruben also became upset with Stone for placing some empty drums under the deck.

*Wiretap*

The trial court approved a wiretap of the telephones of Flores, his parents, and his sister in January 2020.  At the time, Chris Lambert was producing podcasts about Smart's disappearance.

On January 6, 2020, the wiretap recorded part of a telephone phone call between Flores and his mother, Susan.  The telephone call was as follows:

"Susan: I'm asking for you but I need you to make the call. I would think 'cause uh – I need to know where it's at –

"Flores: Yeah –

"Susan: You know to make sure that you're covered 'cause the rest of us are.

"Flores: Yeah.

"Susan: And they're gonna work together, these four attorneys, if we ever get to that point.  Which I don't know if we will or not.  The other thing I need you to do is to start listening to the podcast.  I need you to listen to everything they say so we can punch holes in it.  Um, wherever we can punch holes.  Maybe we can't. Y-you're the one that can tell me."

*First Search of Ruben's House and Appearance of Cargo Trailer*

On February 5, 2020, the police conducted a search of Ruben's home pursuant to a warrant.  In Ruben's bedroom, a detective found newspaper articles relating to Smart's disappearance.

Four days later, one of Ruben's neighbors saw an enclosed cargo trailer and a travel trailer on Ruben's property. The neighbor had never previously seen those trailers at Ruben's house. The cargo trailer was backed up to the garage and the garage door was open.

*Search of Ruben's Property With Dogs and Ground Radar*

Two dogs trained and certified in the detection of human remains independently, and under different handlers, searched Ruben's backyard. Both dogs gave an alert signal under the deck of Ruben's house. There is a significant space between the ground and the deck.

An archaeologist with expertise in the use of ground penetrating radar found an anomaly under the deck where the ground had been disturbed. The anomaly was approximately six feet by four feet with a depth of three to four feet. Smart's body was never found.

*Excavation*

An archaeologist with expertise in the recovery and identification of human remains excavated the anomalous area under the deck. The lack of continuity in the soil showed that there had been a prior excavation. The lack of machine markings showed the prior excavation was by hand using a shovel. Some of the soil had dark staining consistent with human decomposition. Clothing fibers were found in the soil. Soil samples taken from the lower portion of the excavation tested positive for human blood. No blood type or DNA could be extracted from the soil samples.

*Ruben Admits a Felony*

Detectives went to Ruben's home with a warrant to collect DNA samples from Ruben, Flores' mother, and the person who

owned the trailer seen at Ruben's home. Upon reading the warrant, Ruben said, "They haven't committed no felonies." After a brief pause he said, "only me." Ruben stammered a correction stating that he was the only one arrested.

*Uncharged Crimes*

R.D.

In 2008, R.D. was with some friends at a bar. Flores became friendly with the group and one of R.D.'s friends invited him to join them back at R.D.'s house. Flores agreed but said he had to stop by his house first. He was offered directions to R.D.'s house, but he convinced R.D. to go with him. At Flores's house he gave her a glass of water. The next thing R.D. remembered, she was naked on Flores's bed, and he was having nonconsensual intercourse with her. When she regained consciousness again, Flores was having nonconsensual anal sex with her. She had a red ball gag in her mouth. R.D. did not report the incident because she believed rapes were seldom prosecuted. But she contacted the police when she saw Flores's picture in connection with Smart's disappearance.

S.D.

In 2011, S.D. was at a bar with a female friend. Flores approached them and purchased a drink for each. Later, S.D. remembered being alone with Flores at his house. He gave S.D. something to drink, and she began going in and out of consciousness. She remembered being in Flores's bedroom, and he was engaging in nonconsensual intercourse with her. Flores attempted to put a red ball gag in S.D.'s mouth. She did not report it to the police immediately because she had been so confused that night.

10

*Defense*

Dr. David Carter, a professor of forensic science, testified that he had not seen anything from the excavations that confirmed the presence of human remains.

Dr. Elizabeth Johnson, a forensic DNA consultant, testified that a test for human blood in soil samples is unreliable. She said that the accuracy of the test could have been affected by the pH of the soil, which was never tested.

Detective Clinton Cole testified that Hudson said Flores told her he buried Smart at his place in the town of Huasna. Two locations in Huasna were excavated, but neither location contained any human remains.

Hudson's boyfriend testified that she never told him about Flores's admission.

## DISCUSSION

### I. Trial Court's Refusal to Dismiss a Juror

Flores contends the trial court denied him his rights under the Sixth and Fourteenth Amendments by refusing to dismiss a juror.

#### (a) Background

#### First Incident

During a break in the cross-examination of a prosecution witness, Juror No. 273 (Juror), told the bailiff that she wanted to speak to the court. The Juror told the Court:

"I do feel that I'm experiencing some anxiety from the – like, sometimes the aggressiveness of the questions or the repetitions of the questions that had already been answered.

"So I'm like, every time, I guess, you know, it's in my head, and I just feel like a little bit of – and I don't know if that's just me or maybe that's something everybody experiences because we can't

11

talk to anybody about it so I just wanted to hear what you had to say about it.

"And, you know, it's just like – I – it's hard to put into words. It's just like this, like, feeling of tension in my chest so – it's not that I feel a certain way about any particular person at all. I feel I'm very unbiased in the situation so it's not so much directed towards what's – what the topic is, I guess, it's more of just interactions."

The court told the Juror her feelings are natural, and if her anxieties get to the point that she is having difficulties to let the court know. The Juror agreed with the court that it had not reached that point.

Flores moved to dismiss the Juror on the ground that she was biased against the defense because of aggressive questioning. The court denied the request, finding no evidence of bias.

Second Incident

Later in the trial, the prosecution's witness testified that the dark staining of the soil at Ruben's home is consistent with fluids released during human decomposition. The Juror gasped, began to cry and asked the court for a break. At the break the bailiff told the court the Juror apologized and said up to this point she was completely neutral but after listening to the testimony she started to feel Flores is probably guilty.

The trial court had the Juror brought into chambers. The following colloquy took place between the court and the Juror:

"The Court: So I have a few questions for you. My first one is, can you base your decision on the evidence and arguments presented here in court and the law as I provide it to you, without allowing bias, sympathy, prejudice, or public opinion influence your assessment of the evidence or your decision?

"[Juror]: Yes, your Honor.

"The Court: Have you made up your mind about the case?

"[Juror]: No.

"The Court: Are you able to consider all of the evidence, discuss it fully with the other jurors, and listen to the views of your other jurors during deliberations?

"[Juror]: Yes, your Honor.

"The Court: Are you able to follow my instruction that it's important to reach a unanimous verdict if you can but, of course, only if each of you can do so after having made your own conscientious decision; that you should not change an honest belief about the weight and effect of the evidence simply to reach a verdict; and you should not be afraid to change your mind or your opinion if a discussion with the other jurors during deliberations persuaded you to do so. You should not come to a decision simply because other jurors think it's right.

"[Juror]: Yes.

"The Court: And can you perform all of these duties fairly and impartially?

"[Juror]: Yes, your Honor."

After the court asked the Juror further questions raised by defense counsel the Juror ended by saying: "But I didn't come to an ultimate decision or conclusion. I would tell you. I would be like, I can't do this. I can't be unfair or unbiased about it because I've already decided. But I can honestly say that I'm not there, like I can still be open about it, because it could be something else, you know."

The trial court refused to excuse the Juror, finding her to be very honest. When the trial resumed, the court instructed the jury, "You are to keep an open mind throughout the trial. You

13

must not let bias, sympathy, prejudice, or public opinion influence your assessment of the evidence or your decision."

### Third Incident

After some additional prosecution witnesses testified, the Juror requested a short break. She said the cross-examination by the defense "felt a little aggressive so I just need a little bit of a break." She said she wanted to be sure she did not have a breakdown in front of everyone.

The trial court reminded the Juror that she was to listen to all of the evidence and not form opinions until deliberating with the other jurors. The court asked if there was anything that happened that caused her to have a problem with that. The Juror replied, "Do you mind if I have a second to think about it?" Then the Juror said, "It just seemed repetitive and it was – I know that's what you're supposed to do, like I understand that, it just was difficult to see [the witness's] reaction and hear the overtalking of each other, you know, where it felt or became a little bit more aggressive." The court asked the Juror if there was anything about that which had caused her to form an opinion. The Juror answered no. The court denied Flores's motion to exclude the Juror.

### Fourth Incident

During a break in the defense case, the trial court had the Juror brought in to address her social media. The Juror had a social media site that had tips on septic systems, the removal of tree stumps and how to test soil without a pH test kit. The court noted that soil pH was an issue in the case.

The Juror replied that her social media site predated her selection as a Juror, and she had not conducted any research related to the case. The court asked whether she had gotten

14

information from an outside source, the Juror replied, "No. There's – honestly there is people that I know that listen to the podcast, but they know that they cannot tell me anything and I do not ask anything. And if they do start to share something, because everybody knows that I had a hard time one day, I say I can't talk about it."

In moving to dismiss the Juror, Flores's counsel argued, "[W]hy do the friends know that she's on this case, for one thing. And how does she know they're listening to the podcast unless she's at least talked to them about that much? It just doesn't make sense."

In denying the motion to dismiss the Juror, the trial court stated the Juror was credible. The social media site predated her selection as a juror. The Juror went out of her way to avoid exposure to information about the case. She did nothing wrong in telling others she was a juror on the case.

(b) Standard of Review

We review the trial court's denial of a request to discharge a juror for an abuse of discretion. (*People v. Lopez* (2018) 5 Cal.5th 339, 365.)

As it is, the jury remains a fundamentally human institution, and if it is to function at all, we must tolerate a certain amount of imperfection short of actual bias. (*In re Hamilton* (1999) 20 Cal.4th 273, 296.)

Here the Juror told the trial court twice that defense counsel's aggressive questioning of a witness was causing her anxiety. She denied it caused her to be biased or that anything about it caused her to form an opinion. There was no basis for discharging the Juror. She did not claim she was too anxious to continue. She only asked for a break. (*People v. Lopez, supra,* 5

15

Cal.5th at p. 365 [trial court did not err in refusing to disqualify a juror who complained the trial caused her stress but did not indicate she could no longer serve impartially as a juror].) Assuming her comments could be construed as criticism of defense counsel, the criticism was mild; his questions were aggressive and repetitive. Even direct and harsh criticism of defense counsel by a juror is not sufficient to require discharge absent a showing of "serious bias." (*People v. Kaurish* (1990) 52 Cal.3d 648, 694 [trial court not required to hold inquiry where a juror was heard to express momentary exasperation with the proceedings by referring to defense counsel as a "son-of-a-"]; see also, *People v. Zemek* (2023) 93 Cal.App.5th 313, 334, 337-338 [Juror's comment, "This trial's never going to end. That's [defense counsel's] strategy" does not show a juror has made up his mind or is considering extrinsic matters].)

At one point during the trial, the Juror had an emotional outburst in reaction to evidence that the dark staining of the soil at Ruben's home is consistent with human decomposition. The Juror told the bailiff that she was neutral up to that point but has started to feel Flores is probably guilty.

Flores acknowledges that a juror's emotional reaction to evidence is not automatically disqualifying. (*People v. Ramirez* (2022) 13 Cal. 5th 997, 1057.) Here the trial court was able to observe the Juror's emotional reaction in court and her demeanor in the aftermath. The court questioned the Juror at some length and was satisfied the Juror was qualified to continue.

Nor was the Juror's preliminary assessment that Flores is probably guilty disqualifying. Any juror who does not form a preliminary view of the evidence is probably not paying attention. The question is not whether a juror has formed a preliminary

16

assessment of the evidence, but whether the Juror's mind remains open to a fair consideration of the evidence and shared opinion expressed during deliberations. (*People v. Allen and Johnson* (2011) 53 Cal.4th 60, 73.) Here the Juror stated that she had not made up her mind about the case and that she is able to consider all of the evidence, discuss it fully with all the other jurors, and listen to the views of the other jurors during deliberations. The trial court found her credible.

The Juror should not have told the bailiff about her view of the evidence. But she said it as part of an apology for her emotional outburst, not to engage him in a conversation about the case. In fact, there is no evidence that the bailiff engaged the Juror in any conversation. Regardless, it was undoubtedly a breach of the trial court's instruction not to discuss the case with anyone. But violation of the court's instruction not to discuss the case does not require discharge of the Juror, especially when the misconduct was not deliberate and there is no indication the misconduct would continue. (*People v. Holloway* (2004) 33 Cal.4th 96, 124-125.) Here the misconduct was not deliberate and there is no indication it would continue. The Juror simply offered an apology and an explanation for her outburst.

Finally, Flores argues that the Juror violated the order not to discuss the case by informing others she is a juror on the case. But Flores cites no authority that simply telling others she is a juror on the case violates the court's order. In fact, it is a reasonable precaution in a high profile case, so people do not attempt to discuss the case with the Juror or in the Juror's presence.

In summary, the record shows a credible and conscientious juror, concerned with doing the right thing for everyone involved

17

including Flores. Flores's objections taken separately or together do not show the trial court abused its discretion in refusing to discharge the Juror.

## II. *Uncharged Offenses*

Flores contends the trial court erred in admitting evidence of two uncharged rapes.

Evidence Code section 1101, subdivision (a) generally prohibits evidence of prior bad acts to prove a person's conduct on a specified occasion. But Evidence Code section 1108, subdivision (a) provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."

Flores argues that as a threshold to admitting section 1108 evidence the prosecution must show he raped or attempted to rape Smart. Flores cites much authority, but none of it supports his argument.

Evidence Code section 1108 is clear. The only requirement for the introduction of uncharged sexual offenses is that the defendant is charged with a sexual offense. That requirement was met when the prosecution charged Flores with rape or attempted rape in the commission of a murder.

Even if we were to credit Flores's argument, there is more than sufficient evidence to support the admission of uncharged sex offenses. Flores was infatuated with Smart, to the point of stalking her. He told Hudson that Smart was a tease, and he was tired of waiting for her. Smart then had no interest in Flores. On the night of the party, Smart was heavily intoxicated. Others were assisting Smart back to her dormitory when Flores

18

came out of the dark to join them.  When Flores took over helping Smart, he twice stopped to hug her.  Each time Flores stopped to hug Smart, he encouraged Anderson to go on by herself so he could be alone with Smart.  Although Smart was close to her dormitory when Anderson left Flores and Smart, Smart never made it there.  She was never seen again.  Flores's roommate was away for the weekend.  Four dogs alerted for the scent of human remains in Flores's bed.  Flores had a black eye for which he had too many explanations.

Thus the evidence shows that Flores brought Smart in a semi-conscious state to his room where he killed her.  Why would he do that?  The reasonable answer is that he raped or attempted to rape her.  Flores got a black eye when Smart unexpectedly resisted.

### III. Boelter Testimony

Flores contends the trial court erred in admitting Boelter's testimony that Smart looked like she had been given roofies[3].

The prosecutor asked Boelter to explain why he mentioned the possibility that Smart was on drugs at the party.  Boelter answered that he had a personal experience of being roofied at a bar.  Flores did not object.  The prosecutor asked Boelter to continue his explanation.  Flores objected as calling for irrelevant information.  Without ruling on the objection, the court told the prosecutor to ask the next question.  The prosecutor repeated his request for Boelter to explain.  Flores withdrew his objection.

---

[3] A prescription drug medically known as Flunitrazepam but widely known as a date rape drug.  It can cause amnesia and is often used to "aid in the commission of sexual assault." (Wikipedia.org, Flunitrazepam <https://en.wikipedia.org/wiki/Flunitrazepam> [as of Oct. 15, 2025], archived at <https://perma.cc/BKM5-SQPX>.)

The prosecutor asked Boelter if his personal experiences contributed to why he mentioned the possibility of drugs. Flores objected on the grounds that the question is leading, irrelevant, and under Evidence Code section 352. The court overruled the objection.

Boelter explained: "I felt it was a wild feeling after I ingested that drink. I felt really happy and I wanted to dance. I'm not a huge dancer. I was really talkative and social. And then I started to feel really bad and getting sick and then to the point of passing out and my friends carrying me out of this bar. So when I reflected on that I went, whoa, that reminds me of that night and seeing Kristin Smart. So that's where that comes from, from that personal experience."

Flores moved to strike the answer on the grounds of Evidence Code section 352 and no foundation for the answer.

On appeal, Flores argues that Boelter's testimony lacked an adequate foundation for how he knew he had been drugged. Flores waived the issue on appeal by failing to make a timely objection on the ground of lack of foundation. When the nature of the question indicates the evidence is inadmissible, there must be an objection; a subsequent motion to strike is not sufficient. (*People v. Demetrius* (2006) 39 Cal.4th 1, 21.) "An objection to evidence must generally be preserved by specific objection at the time the evidence is introduced; the opponent cannot make a 'placeholder' objection stating general or incorrect grounds (e.g., 'relevance') and revise the objection later in a motion to strike, stating specific or different grounds." (*Id.* at p. 22.)

Here Flores made no objection when the subject of Boelter's belief that Smart was possibly on drugs was first raised. The next time the question was raised, Flores objected as irrelevant,

20

but later withdrew the objection. The third time the question was raised Flores objected as leading, irrelevant and under Evidence Code section 352. After Boelter testified, it was too late to raise lack of foundation for the first time in a motion to strike.

Had the objection been made, it would have made no difference. The foundation for Boelter's testimony was adequate. A witness who is not an expert may testify in the form of an opinion if the testimony is rationally based on the perception of the witness and helpful to a clear understanding of his testimony. (Evid. Code, § 800.)

There is no reason why the "rationally based on the perception of the witness" requirement cannot be met by personal experience. The ruling on the admissibility of lay opinion is reviewed for an abuse of discretion. (*People v. Virgil* (2011) 208 Cal.App.4th 1210, 1254.) Here the trial court did not abuse its discretion. Boelter's testimony that it was possible Smart was on drugs, was based on his personal experience.

The evidence shows that Smart was heavily intoxicated and not in control of her person when Anderson left Smart with Flores, the last time Smart was seen. Boelter did not testify he saw Flores give Smart anything, or even that he saw Smart and Flores together at the party. Nothing in Boelter's testimony remotely suggested Flores drugged Smart.

Flores suggests that Boelter's testimony enhanced the credibility of the witnesses who testified Flores drugged and raped them. The women who testified that Flores raped them were credible because their descriptions of the events was remarkably similar. They did not need Boelter's testimony to enhance their credibility. If Boelter's testimony had any effect on the verdict it was not his testimony that Smart was possibly on

21

drugs; it was his testimony showing Flores was infatuated with Smart.

Flores also complains that the trial court erred in overruling a hearsay objection to Boelter's testimony that he began to consider Smart had been drugged when he read newspaper articles about women being drugged and sexually assaulted.

Evidence Code section 1200 subdivision (a) provides: " 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated."

The evidence was not admitted for the truth of the matter – that Boelter read newspaper articles about women being drugged and assaulted – but only to show why Boelter began to consider that Smart may have been drugged. The verdict did not turn on what Boelter read in the newspaper.

*IV. No Prosecutorial Misconduct*

Flores contends the prosecutor committed misconduct by misusing evidence admitted for a limited purpose to advance an improper character inference.

(a) Background

Both women who testified that Flores raped them testified he inserted a red ball gag in their mouths during the rapes. The police found videos on a computer in Flores's home. The prosecutor wanted to show clips from the videos that showed Flores's face. Flores objected under Evidence Code section 352. The trial court agreed the videos were very graphic because they showed the genital area and faces of naked women. The court found the videos could not be admitted under Evidence Code

22

section 1108 because the women could not be found, and it was impossible to tell whether the activity was consensual.

The trial court limited the prosecution to a single still photograph taken from the videos showing a woman with her eyes closed and a red ball gag in her mouth. The court instructed the jury that the photograph is admitted for the limited purpose of showing, if it does, that Flores owned a red ball gag.

During closing argument, defense counsel referred to the prosecution's case as a "bunch of conspiracy theories." Counsel stated that while "conspiracy theories are fun" the jury should not buy into them.

During rebuttal argument the prosecutor stated: "Did it look like the woman with the ball gag in her mouth was having fun in this conspiracy theory?"

The trial court overruled Flores's objection.

(b) Analysis

There was no misconduct. The prosecutor's argument comment was nothing more than a brief rhetorical flourish in response to defense counsel's argument. A brief comment in response to defense counsel's argument is not misconduct. (*People v. Cortez* (2016) 63 Cal.4th 101, 133.)

Moreover, the jury was instructed that it must decide the case on the evidence, and that the attorneys' comments are not evidence. Here there is highly credible evidence that Flores raped two women after drugging them. Given the evidence, Flores need not be concerned that the prosecutor's brief comment affected the jury's view of his character.

*V. Substantial Evidence*

Flores contends there is no substantial evidence of first degree murder.

23

In reviewing the sufficiency of the evidence, we view the evidence in a light most favorable to the judgment. (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) We discard evidence that does not support the judgment as having been rejected by the trier of fact for lack of sufficient verity. (*People v. Ryan* (1999) 76 Cal.App.4th 1304, 1316.) We have no power on appeal to reweigh the evidence or judge the credibility of witnesses. (*People v. Stewart* (2000) 77 Cal.App.4th 785, 790.) We must affirm if we determine that any rational trier of fact could find the elements of the crime beyond a reasonable doubt. (*Johnson*, at p. 578.)

The trial court instructed on two theories of first degree murder: willful, deliberate, premeditated murder and murder committed in the commission or attempted commission of rape. Substantial evidence needs to support either of the theories to uphold the verdict. (*People v. Sandoval* (2015) 62 Cal.4th 394, 424.)

We explained in part II of this opinion that the jury could reasonably conclude Flores murdered Smart in the commission of a rape or attempted rape, even without the testimony of the women who said Flores drugged and raped them. The addition of the testimony of the two women makes the evidence not simply substantial, but overwhelming.

### VI. Jury Instructions

#### (a) Attempted Rape

Flores contends the trial court erred in instructing on the mental state required for attempted rape of an intoxicated person.

The trial court gave CALCRIM No. 460 on attempt to commit rape. The instruction included the element that "[t]he defendant intended to commit rape." The instruction referred the

24

jury to the separate instructions on rape.  The instruction on rape of an intoxicated person provides that the prosecution must prove defendant had sex with a woman whom the defendant "knew or reasonably should have known" was too intoxicated to resist. (CALCRIM No. 1002.)

CALCRIM No. 1002, on rape of an intoxicated woman, is taken directly from section 261, subdivision (a)(3).[4]

Read together, the instructions tell the jury that the defendant is guilty of attempted rape if the defendant intended to have sex with a woman that he "knew or reasonably should have known" was too intoxicated to resist.

Although rape is a general intent offense, attempted rape is a specific intent offense.  (*People v. Braslaw* (2015) 233 Cal.App.4th 1239, 1248-1249.)  The difference between general intent and specific intent can be seen in the context of available defenses.  Thus the specific intent crime of attempted rape is subject to a good faith, but unreasonable mistake of fact defense. (*Braslaw*, *supra*, at p. 1249.)  The general intent crime of rape, however, requires the mistake of fact to be objectively reasonable. (*Id.* at p. 1250.)  While intoxication can negate the specific intent requirement for attempted rape, it cannot negate the general intent requirement for rape.  (*Ibid.*)

Flores argues that the subjective element of specific intent conflicts with the objective portion of CALCRIM No. 1002 that the defendant "reasonably should have known" that the woman was too intoxicated to resist.

---

[4] Section 261, subdivision (a)(3) provides: "If a person is prevented from resisting by an intoxicating or anesthetic substance, or a controlled substance, and this condition was known, or reasonably should have been known by the accused."

Flores confuses the statutory knowledge element – known or reasonably should have known – with specific intent. They are not the same. (See *People v. Mendoza* (1998) 18 Cal.4th 1114, 1127 [specific intent is a different mental state than knowledge]; see also, *People v. Braslaw*, *supra*, 233 Cal.App.4th at p. 1248 [general intent and knowledge are separate elements].) That the specific intent element of the offense is subjective, does not mean that all elements of the offense must be subjective. Our Legislature provided for an objective knowledge element for attempted rape of an intoxicated person.

A simple example will illustrate the point. A defendant can defeat a charge of attempted rape by raising such subjective state of mind defenses as intoxication and good faith mistake of fact. (*People v. Braslaw*, *supra*, 233 Cal.App.4th at p. 1249-1250.) That is true even where, as here, the attempted rape charge has an objective "reasonably should have known" element. Such defenses attack the specific intent element, which is separate from the knowledge element.

The instructions, as given, correctly state the elements of attempted rape. There is no conflict between the subjective element of specific intent and the objective element of "reasonably should have known."

Moreover, Flores properly made no objection or requested other instructions. If there had been error, it would have been waived. (*People v. Jackson* (2016) 1 Cal.5th 269, 336.)

A jury that concluded that any reasonable person should have known Smart was too intoxicated to resist would certainly conclude Flores knew. As we point out below there is no substantial evidence Flores was too intoxicated to form the intent to rape.

26

(b) Intoxication

Flores argues that the instruction on intoxication misstated the law.

Pursuant to Flores's request, the trial court gave CALCRIM No. 625 on voluntary intoxication as follows:

"You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill, the defendant acted with deliberation and premeditation or the defendant was unconscious when he acted. [¶] A person is *voluntarily intoxicated* if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect. [¶] You may not consider evidence of the defendant's voluntary intoxication for any other purpose."

Flores argues that the instruction limits the defense of voluntary intoxication to "intent to kill," "deliberation and premeditation," and "unconscious when he acted." He claims it does not include the inability to form the specific intent necessary for attempted rape.

Flores did not request any modification to the instruction. Flores conceded that a voluntary intoxication instruction is a pinpoint instruction that the trial court is not required to give sua sponte. He relies on *People v. Castillo* (1997) 16 Cal.4th 1009, 1015, for the proposition that even where the court has no sua sponte duty to instruct, it has a duty not to misstate the law when it does instruct. If the court misstates the law, the defendant may raise the issue on appeal even if his counsel did not object. (*Ibid.*)

27

A jury would understand that the phrase "the defendant was unconscious when he acted" does not mean completely unconscious, because a completely unconscious person cannot act. It must mean that a person was not sufficiently conscious of the nature of his actions to hold him criminally liable. The instruction speaks to the essence of specific intent. Had Flores believed that the instruction was not sufficiently clear as applied to attempted rape, he could have asked for modification.

Flores's defense was that he departed from Smart while she was alive and he proceeded alone to his dormitory room. That was the story he told the police. The intoxication defense carries with it the implication that Smart was with him in his room.

Flores told the police he had been drinking but did not say he was so intoxicated that he could not form the intent to commit rape. In fact, he purported to remember the events of that early morning very well, including the time he went to bed.

In addition, Anderson's description of the early morning events showed Flores was in command of himself and Smart. Flores seemed to appear out of nowhere when he saw Davis and Anderson assisting an incapacitated Smart, the woman with whom he was infatuated. On the way to the dormitories, he twice stopped and told Anderson to go on by herself so that he could be alone with Smart. Flores clearly knew what he was doing.

Finally, two witnesses testified Flores drugged and raped them. That is ample evidence that Flores had a propensity for raping women that he knew were too intoxicated to resist. As the prosecutor told the jury, "For you to vote not guilty you would have to believe that a serial drugger, who enjoyed raping drugged women, had Kristin Smart to himself, by himself, feet from his

28

dorm room, and yet let her go.  You would have to believe that, which is so absurd as to be ridiculous."

In short, there is no substantial evidence that Flores was too intoxicated to form the intent to rape Smart.  In fact, the evidence is to the contrary.

*VII. No Cumulative Error*

Flores contends cumulative error requires reversal or at least reduction to second degree murder.

There was no cumulative error here.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.



GILBERT, P. J.

We concur:


YEGAN, J.


CODY, J.

29

Jennifer Jean O'Keefe, Judge

Superior Court County of Monterey

_____

Solomon Robert Wollack, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Zee Rodriguez, Michael C. Keller and Colleen M. Tiedemann, Deputy Attorneys General, for Plaintiff and Respondent.